Lawson vs. Mowry.

## LAWSON vs. MOWRY.

*March 28 — May 10, 1881.*

VENDOR AND VENDEE of Land. *Rights of vendee of land abutting upon vendor's hydraulic canal.*

While, by the law of this state, one who should receive from the owner of land through which a canal passes, a deed of a lot abutting upon such canal, which is a public highway, would ordinarily take to the center of the canal, yet he would take no right, as against the other riparian owners, to draw off the waters of the canal through his lot to a level lower than that of any part of the canal on his premises, for the purpose of creating a water-power. And where such a canal, and the lock at its foot, and the dam (in a natural stream above it) by which the water is turned into it, were constructed at great expense, by the original owners of the land, under authority of the legislature, for the purpose of creating a hydraulic power as well as a highway, and the lots between the canal and the natural stream below the dam were sold for a trifling consideration, without any expressed grant of water-power in the deeds, and the lots as platted were not intended to extend to the canal (though this was subsequently enlarged so that the lots in fact abutted upon it), and separate leases of the power were taken from the grantors by the grantees of the lots, and the rents continued to be paid for many years, and the lessors,

with knowledge of the lessees, during that time, went to great expense in maintaining the dam, etc.: *Held*, that a lessee cannot resist payment of the rent under his lease on the ground that he had a right to the water as a riparian owner, and took his lease under a mistake as to his legal rights.

ERROR to the County Court of *Winnebago* County.

This action was brought to recover water rents alleged to be due under two deeds of indenture made December 26, 1857, between Charles Doty, Curtis Reed and Harrison Reed, of the first part, and the defendant, *Spencer Mowry*, as party of the second part, by which deeds the former demised and let to the latter twelve hundred superficial inches of water, to be taken from a certain canal and to be used on certain lots named in said deeds for a term of 99 years, renewable forever. The lots named in said instrument were lots 21, 22, 25 and 26, block 1, in the village of Menasha; and the annual rent reserved was at the rate of $20 per one hundred inches. The rents alleged to be due and unpaid were those which fell due on the 1st of January in 1876 and 1877. The plaintiff claimed as assignee of Doty and the Reeds. The answer was, in substance, that at the time of the execution of said leases Doty and the Reeds falsely claimed and represented to the defendant, and to his agent, one E. D. Smith (by whom said instruments were executed on defendant's part), that they were the owners of said water; that defendant and his said agent executed the instruments in reliance upon such representations; and that in fact neither said Doty and Reeds nor any of them had any right, title or interest in or to said water or any part thereof, or in or to any land along, over or upon which such water could run, nor had they or any of them ever subsequently acquired such right, title or interest. It is further alleged that if at the making of said instruments plaintiff's assignors had any right, title or interest in or to said water, they had only a defeasible estate or interest therein; that said water was a part of the navigable waters of Fox river and Lake Winnebago; and

that about January 1, 1873, the government of the United States became, and had ever since continued to be, seized of said waters in fee, and had been in possession of the same to the exclusion of all other persons. For a further defense and by way of counterclaim, the answer then alleges that defendant is the owner in fee simple of lots 21 to 27 in said block 1 in the village of Menasha; that the northerly part of said block abuts upon a certain canal, which is a part of the Fox and Wisconsin River Improvement; that said canal is fed by a dam across the Fox river (a navigable stream) at said village of Menasha, at or near the outlet of Lake Winnebago; that said river forms the westerly boundary of said block; that the waters running through said canal are the navigable waters of said river and lake; that the canal runs from said dam, by and along said block, and the lots so owned by defendant, to Little Lake Butte des Morts, about one mile from the head of said canal; that some time in 1848 or 1849, plaintiff's said assignors built a dam at the place where such dam is now located; that thereafter, in 1849, said Doty, who claimed to be the owner of the premises now known as block 1, platted the same, laying it out as block 1 and dividing it into lots, " which said block 1 abuts on said canal as aforesaid;" that about 1855, Doty and the Reeds conveyed all their interest in the said dam to the Fox & Wisconsin Improvement Company; that Doty, by deed or deeds duly executed, conveyed the lots so platted by him to defendant, or to those under whom he claims, without any reservation whatever as to said pretended rights of water or water-power; that, prior to the execution of the leases sued upon, the right to take and use the waters flowing through said canal had become vested in the grantees of said Doty; that, at the time of the execution of said leases, the Reeds had no interest whatever in any real estate adjoining or abutting upon said canal, but any interest they might have had prior thereto in any such real estate had been previously conveyed, and by subsequent mesne conveyances had come to defendant

or to his grantors; that defendant's lots above mentioned, and all other lots in block 1, are situate between said canal and the natural channel of Fox river; and that defendant's said lots abut upon said river on the south and upon said canal on the north, and extend to the center of both the river and the canal. The answer then again alleges that defendant was induced to execute the leases by false representations of Doty and the Reeds as to their ownership of the water. It further alleges that plaintiff claims the right under said instruments to enter upon the premises above mentioned, and particularly upon lots 21, 22, 25 and 26, and to take possession of said waters now naturally flowing through said canal, and through divers bulkheads and passage-ways over and through said lots, and to prevent such waters from flowing on said premises, which claim is founded upon certain stipulations in said instruments; that defendant and his grantors have for many years been in the actual possession of lots 21 to 27; that there are erected thereon factories and mills owned by and in the actual possession of defendant, and run by the water flowing through said canal and into the bulkheads or raceways of the defendant over and along said lots; and that plaintiff's said claim constitutes a cloud upon defendant's title, etc. Judgment is therefore demanded that the instrument sued upon be adjudged void as between plaintiff and defendant; that defendant be forever released from the obligations thereof; and that plaintiff be forever restrained from seeking to enforce the same, etc. There was a reply in denial of the counterclaim.

The facts found by the court were substantially as follows: Prior to 1848, Charles Doty became owner of lots 1, 9 and 10 (by the government survey) in section 22, in the city of Menasha. By act of the legislature approved March 10, 1848, Curtis Reed, Charles Doty and their associates were authorized to build a dam across the north channel or outlet of Lake Winnebago, on a portion of said section 22, and to make use of the waters of said channel for hydraulic purposes. Under said

act, Reed and Doty built a dam abutting on lot 1 in section 22 on the south side, and on lot 9 in section 22 on the north side of said channel. They commenced this dam in 1848, and at the same time commenced to dig a race or canal to take water from said outlet, above the dam, and conduct it along north of said outlet to points convenient for mill-sites on the north side of the outlet. This canal or race was on lot 9; was from fifteen to thirty feet wide, and about three feet deep; and was, before the fall of 1859, extended to a point in or west of the west line of lot 27, block 1, mentioned in the pleadings. In 1849, persons who had bought of Charles Doty lots between this canal or race and said outlet, began to draw water from the canal for hydraulic purposes, under leases of water or of hydraulic power separate from their deeds of the land, "so far as the evidence shows under what claim they used water." In May, 1849, Doty made and caused to be recorded a plat of the town of Menasha, which included part of said government lot 9. This plat is annexed to the findings as Exhibit G. In 1850 Doty made, and in 1852 he caused to be recorded, a further plat of land in lots 9 and 10, which plat is annexed to the findings as Exhibit H. The canal or race above mentioned was excavated along the south side of a strip which on Exhibit G is marked "Reserved;" and it was made with steep banks, and so that the top of the south bank "came to or nearly to but somewhat north of the stakes driven by the surveyors to indicate the corners on the north line of the lots laid out in block one;" and the banks were about seven feet in perpendicular height from the bottom of said race. Charles Doty and Curtis Reed (who claimed some interest, with Doty and under his title, in said lots 1, 9 and 10 in section 22) constructed said dam, dug said race, and made and recorded said plats and sold lots therefrom, including lots 20 to 27 in block 1, claiming title to said lots under a written conveyance thereof to said Doty; and defendant claims said lots 20 to 27 by conveyances from Doty and his grantees. In 1849, the canal for

improving the navigation of the Fox river, under the authority of the state and its board of public works, was located upon and along the "Reserved" strip in Exhibit G; and, under a contract with the board of public works, further excavations were made upon said strip for a canal for purposes of navigation, to be forty-four feet wide at the bottom, with banks six feet high and having a slope of one foot perpendicular to two feet horizontal. By some subsequent arrangement between Doty and Reed and the board of public works, it was agreed that the width of the canal should be increased to one hundred feet on the bottom, said widened canal to extend ten feet into Water street; and excavations were made under this agreement. The forty-four foot canal was commenced on the north side of the "Reserved" tract, and "a strip or cove" (?) was left between it and the first canal or race. The one-hundred-foot canal was made by taking out this "cove." (?) The south bank of the canal thus made was nearly the same as the south bank of the first race; but the slope was greater, being two feet horizontal to one foot perpendicular; and this carried the water line, and the upper line or edge of the bank, further south. In 1853, the work on this canal and improvement was transferred by the state to the Fox & Wisconsin Improvement Company. In July, 1855, an agreement in writing under seal was entered into between the Improvement Company as party of the first part, and Doty and the Reeds as parties of the second part, which is annexed to the findings as Exhibit M. By the terms of this instrument, the company quitclaimed to the parties of the second part, their heirs and assigns, all rights or claims of said company, acquired or to be acquired, "in or to the water-power and use thereof, at Menasha, . . . and the sole right to use, lease, sell or dispose of all the surplus water at said place, to be taken from the dam or at any point on the canal, doing no unnecessary damage and not interfering with the navigation of said canal." The parties of the second part, among other things, quit-

claimed to the Improvement Company all their rights, title
and interest in and to the dam by which the water was turned
into said canal, subject to their right to use the surplus water
as above stated. [The other provisions of the instrument seem
not to be important here.]  The canal was completed about
1856 by the Improvement Company, for purposes of naviga-
tion, on a plan requiring one hundred feet in width at the bot-
tom, with banks having a perpendicular height of eight feet
and a slope of two feet horizontal to one foot perpendicular;
work was done pursuant to this plan, by the company or the
board of public works, on the south bank, in front of lots
1 to 27, in block 1; and the south bank remains sub-
stantially as thus constructed, except that near the water-
line, above and below it, the wash of the water has excavated
the bank to some extent.  When the canal was completed,
"the water-line along the south bank, on lots 20 to 27, was at
or nearly coincident with the north line of those lots as platted,
at the ordinary stage of water."  At the present time, "the
water-line along lots 25 to 27 is at the north line of those lots;"
and on the north line of lots 21 and 22, away from the bulk-
heads of the flumes, the water is from one and one-half to two
feet deep, by measurements taken when the mills on the canals
were not running.  Lots 20 to 27 were conveyed by Charles
Doty to various persons at various dates, from October, 1849,
to April, 1855, and, by divers conveyances from Doty's
grantees, the fee of them all became vested in the defendant
before the close of April, 1856 — lot 25 having been conveyed
directly by Doty to the defendant in October, 1852, for the con-
sideration of $75.  The conveyances of these lots by Doty
describe them by their several numbers as lots in block 1 in
the plat of Menasha, and convey the lots with the heredita-
ments and appurtenances thereunto belonging, and express no
reservation.  The leases sued on were made as alleged in the
complaint and above stated.  In the winter of 1875–6, plaint-
iff was the owner of divers lots on said canal, and became the

assignee of all Doty's title in the canal, dam and hydraulic power on said north outlet of Lake Winnebago, of all his interest in the leases sued upon, and of all rents accruing thereunder after July 1, 1875. Up to the 22d day of March, 1877, Doty and the Reeds and *Lawson* and *Mowry* and E. D. Smith (*Mowry's* agent) supposed that the north line of lots 20 to 27 was at or near and substantially coincident with the top of the south bank of the canal, and that the slope of the canal did not encroach upon the lots or run to any point south of the north line of the lots as platted. This was a mutual mistake of fact of all parties, and existed when the lots were conveyed and when the leases were made. At the time of the conveyance of the lots, the grantees understood that they could lease water if they wished to use it for hydraulic power. The consideration paid to Doty for lots in block one was from $25 to $75 per lot. The hydraulic power used on said lots by defendant is produced by taking the surplus water, not needed for navigation, from the canal through bulkheads into flumes on the north end of the lots, and discharging it into the north outlet at the south end of the lots. There is practically no fall of the canal or river on or against these lots. The hydraulic power used on them is produced by the dam at the head of the canal. The level of the canal is about ten feet above the level of the river at these lots. When Doty and Reed built the dam, dug the first race and made the plat, they intended to secure the location of the canal for navigation, specified in the existing acts of congress, on the strip marked "Reserved," and also to secure a hydraulic power to be used on the lots along between the canal and the river. This dam is on a river or channel about twenty-five rods wide, about one mile from Lake Winnebago above, and about one mile from Lake Butte des Morts; and the hydraulic power is the fall of water through this outlet from one lake to the other. Doty and Reed expended about $30,000 of their own money in building a dam and race and a basin near the foot of the canal.

Lawson vs. Mowry.

After the conveyance of the dam to the Improvement Company, and before the commencement of this action, Reed and Doty and the plaintiff expended several thousand dollars in repairs on the dam and canal to preserve the hydraulic power, and about one thousand dollars in building a guard-lock or bulkhead at the head of the canal for the protection of the hydraulic power. The one thousand dollars last named was expended by Reed and *Lawson* in 1875, *Lawson* acting under a parol purchase of the Doty interest, afterwards completed by deed. These expenditures made to preserve and protect the hydraulic power, and especially that made in 1875, were made with the knowledge and at the request of the lessees of water or hydraulic power, including the defendant, acting by his agent, E. D. Smith, and were made by Reed and Doty and *Lawson* as lessors and owners of the hydraulic power. The parties using water or hydraulic power from said canal, including the defendant, have from time to time, in cases of accidental breaks around the flumes or in the bank of the canal, united in making repairs thereon at their own expense, which they have not asked Reed or Doty or their assignees to refund to them. The defendant and those claiming under him have, from the time of the execution of the leases, used the water therein described, and have paid the rent accruing therefor up to that installment coming due January 1, 1876; the defendant, by his agent, E. D. Smith, having paid said rent for about twelve years of the time while using the water in manufacturing for the defendant. When the leases were executed, *Mowry* supposed, and always thereafter supposed, that the lots ran to the canal and abutted on and were bounded by the canal; he has never offered to surrender his leases otherwise than as appears by his answer herein; nor has he ever offered to discontinue the use of water on the lots specified in the leases.

The conclusions of law reached by the court upon these facts are as follows: 1. That the agreement between Reed

and Doty on one part and the Fox & Wisconsin Improvement Company on the other part, left in Doty and Reed, or in Doty, the ownership of the franchise granted by the act of 1848, and of the hydraulic power created by the dam built under it, and an easement or interest in the dam to take the water not needed for navigation from the dam directly to mills by flumes, or by the canal to any part thereof, and thence by branch canals or flumes, or both, to mills, for hydraulic purposes; and that they or Doty retained the ownership of the soil in the bed of the canal within the limits of the parcel "Reserved," not platted into lots by Exhibits "G" and "H." 2. That Doty and his grantees and assignees are the owners of the lands in lots 9, 10 and 1 in section 22, and, by virtue of such ownership and the building of the dam, he and Reed became the owners of the hydraulic power furnished by the dam, and still own so much thereof as they have not conveyed away. 3. That by the conveyances of lots with hereditaments and appurtenances, and without grant of hydraulic power, made by Doty, his grantees of such lots took no right to use the water of the canal for hydraulic purposes by drawing it from the canal and turning it into the river. 4. That the encroachment, if any, of the waters of the canal upon the north end of defendant's lots, whether by mistake of the board of public works or of the Fox & Wisconsin Improvement Company, or by wash of the water of the canal, has not changed the legal or equitable rights of the parties in relation to the use of the waters of the canal for hydraulic purposes by diverting them from the canal into the river. 5. That the contracts sued on are leases, and the relation of landlord and tenant exists between plaintiff and defendant. 6. That defendant is estopped from denying plaintiff's title, having gone into possession under it and having retained such possession. 7. That defendant is estopped from claiming a rescission of the leases, by the length of time during which he has acted under them and sought the benefit of them. 8. That defendant is estopped from claiming a rescission of the

leases by having induced the lessor or his assignee to expend money for the protection of the leased property. 9. That defendant is estopped from claiming a rescission of the leases for the reason that if, by a mutual mistake of fact, he leased and agreed to pay for what he already owned, then, by the same mistake of the same fact, he got by deed what he did not pay for, and Doty parted with what he got no consideration for, and by both deed and lease the plaintiff granted and the defendant got just what by deed and lease the defendant paid and agreed to pay for; that if there were mistakes of fact or law, one cured the other; and as all the instruments together effect the intention of the parties, all should stand. 10. That plaintiff should recover of defendant $590 (the amount of rents due and unpaid), with costs.

Judgment was rendered in pursuance of these conclusions; and *Mowry* sued out a writ of error to reverse such judgment.

*Charles W. Felker*, for the plaintiff in error:

I. It was the intention of Doty and Reed to dedicate to the public the strip of land marked "Reserved." Their anxiety to have the canal dug through this strip, and the constant user by the public of the canal with their consent, taken in connection with all the legislation on the subject from the ordinance of 1787 to the present time, declaring the work a public highway and forever free, are conclusive evidence of such dedication. *Weisbrod v. C. & N. W. R'y Co.*, 18 Wis., 41; 21 id., 609; *Pettibone v. Hamilton*, 40 id., 402; *Yates v. Judd*, 18 id., 118; *Arnold v. Elmore*, 16 id., 509; *Gardiner v. Tisdale*, 2 id., 153; *Ely v. Bates*, 5 id., 467; *Sanborn v. Railway Co.*, 16 id., 19; *Mariner v. Schulte*, 13 id., 692. The lots abutting on the canal were subsequently conveyed by Doty by warranty deed without reservation. The grantees of such lots, therefore, took to the center of the canal. *Delaplaine v. Railway Co.*, 42 Wis., 214. If this be true, then the agreement of the plaintiff in error with the assignor of the defendant in error to pay for the water which he should use on his lots, running

through this canal, was in effect buying his own land, or the right to use the water which was part and parcel of the land and inseparably connected with it. Angell on Watercourses, § 90. The agreements, therefore, are without consideration, and cannot be enforced. If the obligations should be construed as leases, they cannot be enforced, because no estate passed. 4 Wait's Act. & Def., 225; Taylor's Landl. & Ten., § 382; *Earl of Portmore v. Bunn*, 1 Barn. & Cress., 694; *Dwinel v. Barnard*, 28 Me., 554. It is of the very essence of a lease, (1) that there be an estate to pass, and (2) that the lessor be in possession and able to make livery of seizin. Shep. Touch., 267; Taylor's Landl. & Ten., §§ 84, 85. No estate could pass, because the grantor of the assignee had conveyed the riparian estate without burdening it with the right to enter and control the water. There can be no right in water separate from riparian ownership. Angell on Watercourses, §§ 5, 8, 9, 90, 94; *Lyon v. Fishmonger's Co.*, L. R., 1 App. Cas., 662; 17 Eng. Rep., 51–70; 42 Wis., 229, 262–4; *Johnson v. Jordan*, 2 Met., 239; 2 Beasley Ch., 450; *Noonan v. Orton*, 4 Wis., 341; *Owen v. Field*, 102 Mass., 104. It does not avail the defendant in error that this was an artificial instead of a natural watercourse. The canal is a substitute for the natural channel of a navigable stream, and became a public highway, subject to the same rights of user by the public and by riparian owners as the old channel. Angell on Watercourses, §§ 58, 141; *Dwinel v. Barnard*, 28 Me., 562; *Warner v. Southworth*, 6 Conn., 471; 12 N. Y., 381.

II. The state has no authority to deal in water-power for hydraulic or other purposes. By the right of eminent domain it may take, or authorize to be taken, private property for public use, but it can go no further. It cannot, by virtue of this right, take private property to increase the revenues of the state. Neither can it take private property and hold and lease it for the purposes of revenue. Nor can it take private property for private use; and private property taken for pub-

lic use reverts to the owner when the public use ceases. 60 N. Y., 242; 55 Pa. St., 361, 16; 104 Mass., 1. And the state could acquire no rights to running water, to surplus water, or hydraulic power, except by condemnation of land through or by which the water ran. No condemnation proceedings relating to these lands were ever had. In 1853 the state granted such rights as it had, to the Fox & Wisconsin Improvement Company. In 1855 that company bought this dam and the right of way for this canal, from Doty and the Reeds. The company conveyed to Doty and Reed, by the contract of 1855, the right to all the running water not needed for navigation. The contracts under which the defendant in error claims, were made in 1857. Prior to the making of the contracts, Doty had conveyed these lots by warranty deed without reservation. Neither Doty nor his assignee, therefore, can claim any right to this water on account of this dam, because they had parted with all their right in it two years before the making of these contracts. They cannot claim the right as riparian owners, because before the contracts were made they had by deed parted with their right. Their right to the running water, therefore, rests wholly upon the grant from the Improvement Company. But as soon as the state or its grantee authorized private parties to use or sell these waters or any waters or hydraulic power for private use, the public use ceased, and such pretended sale was wholly without authority of law, and the grantees of the Improvement Company took nothing by this pretended grant, and therefore had nothing to sell to the plaintiff in error. See Cooley on Con. Lim., 527; *Buckingham v. Smith*, 10 Ohio, 292; *Varick v. Smith*, 5 Paige, 137; 9 id., 547; Angell on Watercourses, § 94.

III. No estoppel against the plaintiff in error can be sustained on the grounds stated by the court below. 1. A lease must be of lands, tenements and hereditaments in order to create the relation of landlord and tenant between the parties. It cannot exist as to a mere right or chose in action. This

was a mere contract between the parties, and not a lease. Taylor's Landl. and Ten., § 154; 1 Washb. on R. P. (3d ed.), 407. In any case the tenant may show mistake or fraud, and the better opinion seems to be that if he take a lease of land of which he is already in possession, he may dispute the title. *Swift v. Dean*, 11 Vt., 323; 4 Wait's Act. and Def., 259; Bigelow on Estoppel, 389. The plaintiff in error went into possession of nothing under the contract. The right of user subject to the public easement was part and parcel of the premises owned by him. 2. The second ground of estoppel is, in effect, that because the plaintiff in error has through fraud or mistake for twenty years paid money upon a contract, which in law and equity he ought not to pay, he must continue paying in the future. As to the benefit he may have received under the leases, it is a mere corollary of the first ground of estoppel. 3. Neither in the contract with the Improvement Company nor in the so-called leases is there an agreement on the part of Doty to keep this dam or canal in repair. All repairs, therefore, made by him or his assignee, must be considered as voluntarily made. Both Doty and his assignee owned other property on this canal, and there is no evidence tending to show that they expended money solely on the faith of the contracts with the plaintiff in error. The doctrine of estoppel *in pais* proceeds upon the ground that a party, by concealment or fraud, or acts or declarations which amount to concealment or fraud, has placed the other party in such a position that it would be a fraud to allow him to show the real truth. Here each party had equal means of knowledge, and the condition of affairs was equally known to both parties. *Brant v. Iron Co.*, 93 U. S., 326; *Kingman v. Graham*, 51 Wis., 232. All the elements of estoppel *in pais* are wanting. Bigelow on Est., 480; *Swift v. Dean*, 11 Vt., 323-5. 4. There can be no estoppel in this case on the ground of a mutual mistake of fact. There was no testimony tending to show what the intention of Doty was when he conveyed

this property. Nor would such evidence be competent. No matter what his intention was, his grantee took to the middle of the stream. If the assignor of the defendant in error had no right or interest in the thing pretended to be granted in these obligations, they cannot be enforced in an action at law. A promise to pay under a mistake of law cannot be enforced. 11 Vt., 323; *May v. Coffin*, 4 Mass., 342; *Warder v. Tucker*, 7 id., 452; *Freeman v. Boynton*, id., 488; Taylor's L. & T., § 382.

*Moses Hooper*, for the defendant in error.

CASSODAY, J. There is no dispute but that *Mowry* was the owner and in possession of lots 21 and 22, and also lots 25 and 26, at the time of making the leases in question. It is urged with much force in his behalf, that, as the south water-line of the canal, as completed, was at or nearly coincident with the north line of his lots, as found by the court, he took title, by virtue of the lots, not only to the center of the river, but also to the center of the canal, and therefore had the legal right, as riparian owner, independent of the leases, to draw from the canal, through his lots, into the river, the amount of water mentioned in the leases, for the purposes therein designated, and hence, that his covenants and agreements therein to pay water rent were wholly without consideration. It is true, the court found that when Doty and Reed built the dam and dug the first race and made the plat, they intended to secure the location of the canal for navigation, specified in the existing acts of congress, on the strip marked "Reserved," and also to secure a hydraulic power to be used on the lots along between the canal and the river; but it was also found that practically there was no fall in the canal or river on or against these lots, but that the hydraulic power was produced by the dam at the head of the canal, and that the level of the canal was about ten feet above the level of the river at these lots. The lots themselves were disposed of by Doty for

a mere trifling consideration. Doty and Reed had themselves
expended about $30,000 in building the dam, raceway and
basin near the foot of the canal, and the improvement com-
pany several thousand more. It was only the surplus water,
not needed for navigation, that could be taken from the canal,
through bulkheads and flumes, and used for hydraulic pur-
poses, and then discharged into the river. It is obvious that
it was the dam, canal, and lock at the mouth of it, altogether
as a whole, which created the water-power and artificial chan-
nel for navigation. It was essential, also, that each and every
part should be in good repair, in order to secure surplus water
not needed for navigation anywhere along the line.

If *Mowry*, as riparian owner of the four lots in question
and independent of the leases, could divert a portion of the
water from the canal into the river by means of artificial chan-
nels cut through these lots, and use the power created by the
fall, while passing, for propelling machinery, then it necessarily
follows that the respective owners of each of the other thirty
lots would have a similar right, to say nothing of the owners
of lots lying between the canal and river northwesterly of lot
34, or owners of lands abutting upon the northerly side of the
canal. If such lot-owners each had such right, then what was
the extent of it? Of course, the right would necessarily be
limited to the surplus water not needed for navigation. But,
even then, the exercise of it by some would to that extent im-
pair the exercise of it by others. Of course, such surplus
waters could be apportioned between such owners severally;
but as water, like air, is a constantly moving element, it would
seem to require covenants or agreements to regulate the re-
spective rights of parties. But if the right to turn the waters
from the canal into the river by such artificial channels is de-
rived solely from such riparian ownership, then upon what
theory could one of such owners restrict any of the others in
the exercise of a right which he claimed for himself?

It is conceded upon both sides that no one has any property

in any of the particles of water as such, and hence there could be no partition of it by reason merely of the ownership of lots. It is the use of water while passing that gives it value. If its passage at a given point is by a level plane, then is its use at that point to be confined to the purposes for which it is adapted while in that condition,— as, for instance, navigation,— or may a fall be created by an artificial channel? Were it conceded that the lots extend not only to the center of the river, but also to the center of the canal, and that *Mowry* had all the rights in the canal and its waters of any riparian owner, then undoubtedly he would have had the right to use the land in any way compatible with the use of the canal for navigation, provided he did not abridge corresponding rights of other riparian owners. *Walker v. Shepardson*, 4 Wis., 486; *Greene v. Nunnemacher*, 36 Wis., 50; *Delaplaine v. Railway Co.*, 42 Wis., 214; *Diedrich v. Railway Co.*, 42 Wis., 248. But would he, as such riparian owner, have the right, by means of an artificial channel through his own lot, to create a water-fall by turning the waters of the canal through the same into the river? Can a person owning land from one stream to another rightfully turn the waters of the one having the greater altitude into the other, by means of an artificial channel through his own land?

In *Sampson v. Hoddinott*, 87 Eng. Com. L., 590, it was held that the detention of water in that case by one of several riparian owners, for irrigation, was such that an action would lie for the injury, and that every proprietor of lands on the banks of a natural stream has a right to use the water, provided he so uses it as not to work any material injury to the rights of the proprietors above or below him on the stream.

In *Wilts & Berks Canal Nav. Co. v. Swindon Waterworks Co.*, L. R., 9 Ch. Ap. Cas., 451, a canal company, having power to supply their canal with water from the neighboring streams, bought a mill, and turned the mill-stream into the canal. Many years after, the water-works company diverted

part of the mill stream, and thereby supplied with water a neighboring town; and it was "*held* that the canal company . . . were riparian proprietors, and had power to prevent the unlawful use of the water by other riparian proprietors, and that the supply of a neighboring town was such unlawful use." It was also there held that the canal company might sell surplus water. The doctrine of that case was approved on appeal, although the decree was modified. L. R., 7 H. L., 697; *S. C.*, 14 Moak, 86.

In *Miner v. Gilmour*, 12 Moore, P. C. C., 156, Lord KINGSDOWN stated the law thus: " Every riparian proprietor has a right to what may be called the ordinary use of the water flowing past his land." He also has the "right to the use of it for any purpose, . . . provided that he does not thereby interfere with the rights of other proprietors, either above or below him. . . . He has no right to interrupt the regular flow of the stream, if he thereby interferes with the lawful use of the water by other proprietors, and inflicts upon them a sensible injury."

In *McCalmout v. Whitaker*, 3 Rawle, 90, GIBSON, C. J., thus tersely states the rule: " The water-power to which a riparian owner is entitled, consists of the fall in the stream *when in its natural state* as it passes through his land or along the boundary of it; or, in other words, it consists of the difference of level between the surface where the stream first touches his land, and the surface where it leaves it." And this was sanctioned in *Brown v. Bush*, 45 Pa. St., 66.

In *Miller v. Miller*, 9 Pa. St., 74, it was held that "a supra-riparian owner is liable to the owner of the land below him for every material diminution of the flow of the water by a diversion from the stream, whether for irrigation or other purposes; and this, though no actual injury may have been suffered." To the same effect are *Tyler v. Wilkinson*, 4 Mason, 397; *Webb v. Manuf'g Co.*, 3 Sumn., 189; *Mayor v. Appold*, 42 Md., 442; *Tillotson v. Smith*, 32 N. H., 90;

*Parker v. Griswold*, 17 Conn., 288; *Harding v. Water Co.*, 41 Conn., 87; *Gleason v. Manuf'g Co.*, 101 Mass., 72; *Van Hoesen v. Coventry*, 10 Barb., 518; *Clinton v. Myers*, 46 N. Y., 511.

No case has been cited which would seem to authorize *Mowry* to tap the canal merely because his land was contiguous thereto; but, on the contrary, the authorities cited above seem to indicate pretty clearly that, even if he had the rights of a riparian owner in the canal, yet they would not have authorized him to divert the waters therefrom by means of an artificial channel through his lots to the injury of other riparian owners above or below. It was the legislature which gave the authority to obstruct the channel of the river by the building of the dam and canal, and to make use of the water-power thereby created for navigation, and the surplus for hydraulic purposes. The water-power thus created by the dam was not necessarily confined to the use of it at the dam. It is common to conduct water from a pond created by a dam by means of artificial channels, in order to make available the increase of the head by reason of the additional fall in the bed of the stream below the dam. The embankment or land between such artificial channel and the bed of the stream is, nevertheless, as necessary to preserve the water-power as the dam itself. It is, in effect, nothing less than a wing of the dam. The canal, down as far as the lock, is in effect nothing less than an enlargement or arm of the pond created by the dam. It is the fall of the water which gives the power, and the power which gives the value for hydraulic purposes. The right to create and maintain the power, as well as the canal, was authorized by legislative grant to Doty, Reeds and their associates; and, to be rightfully enjoyed by others, it must be derived from them or some of them.

By means of the dam, canal, embankment and lock, the power derived from the surplus water could be made available at the lots in question by means of an artificial channel; but

the right to create such channel and use such power at the lots was not derived exclusively from the ownership of the lots themselves, but reached back to the authority to create and maintain the dam, canal and lock, and to use the surplus water for hydraulic purposes. Any other theory would leave the owner of every dam and water-power at the mercy of every person owning land from the pond above the dam around the same to the river below, and through which an artificial channel could be cut. It would take from the dam, and the water-power created by it, much of its value, and transfer it, without consideration, to lands in the vicinity. The right given by deed to draw water from a water-power and use it in propelling machinery, without designating the particular land upon which it shall be used, has frequently been recognized by this and other courts. Such right, as acquired by deed or grant, reaches back to the dam, and gives an interest in the power thereby created. *Smith v. Ford*, 48 Wis., 162–6; *Spensley v. Valentine*, 34 Wis., 154; *Woolliscroft v. Norton*, 15 Wis., 198; *Noonan v. Orton*, 4 Wis., 335; *Crittenden v. Field*, 8 Gray, 621; *Whittier v. Manuf'g Co.*, 9 N. H., 454.

But here the lots of *Mowry*, as platted, were not intended to extend to the canal. Plat G shows a vacant strip between them and the lands marked "Reserved," and plat H shows a vacant strip between the lots and the canal. It is very evident from the record that neither *Mowry* nor any one else had any conception that the mere ownership of the lots gave him any right to draw water from the canal, until quite recently. In fact, the gist of the defense is, that he was mistaken as to his legal rights until recently. To acquire the right to draw water from the canal, and use it in propelling machinery, and then discharge the same into the river below the dam, he procured the leases in question. By executing the leases, he acknowledged that the lessors then had the property, rights and privileges thereby purporting to be granted. To escape from the doctrine of estoppel, applicable in such cases, it is urged that

*Mowry* was mistaken in his legal rights. But we are unable to discover any such mistake, and the long time which elapsed between the making of the leases and the alleged discovery of the mistake, in a matter so valuable to himself, seems to very much weaken the importance of the alleged discovery. It is manifest, not only from the nature and character of the property, its surroundings, and the plats in evidence, but also from the leases themselves, that by the mere conveyance of the lots by their numbers, there was no intention to transfer to the grantee the valuable water rights afterwards stipulated for by the leases. The intent in such cases, where it is not precluded by the express words of the grant, is always an important subject of inquiry.

In *Bradford v. Cressey*, 45 Me., 13, RICE, J., said: "The intention of the party is always to be sought in the interpretation of deeds, as in other written instruments. If the language leaves that intention at all doubtful, the instrument should be examined and construed, when practicable, by the light of the circumstances which surrounded and were connected with the execution of the instrument." See *Mott v. Mott*, 68 N. Y., 246; *Babcock v. Utter*, 1 Keyes, 410; *Hatch v. Dwight*, 17 Mass., 289. Construing the conveyance of the lots in question, for the trifling consideration named, in the light of the circumstances which surrounded and were connected with their execution, the intent of the grantors and grantee therein clearly appears to be just what, not only Doty and the Reeds, but *Mowry*, in effect declared it to be in the execution of the leases, to wit, a simple conveyance of the lots, without any intent to grant any right or privilege in the dam, water-power or canal. As stated, Doty and the Reeds had granted to the improvement company the right of way for the canal, and the right to maintain the same, and all their right, title and interest in the dam — subject, however, to their right to use the surplus water and privileges, and to maintain and keep in repair all flumes, races, bulkheads, waste-weirs and

other erections for the use of the water; and the improvement company thereby granted to them, their heirs and assigns, all their right and claim then present or prospective in said water-power and the use thereof at Menasha, and the sole right to use, lease, sell or dispose of all the surplus water to be taken from the dam or any point on the canal. The property, rights and privileges thus designated as belonging to Doty and the Reeds, including the leases in question, became transferred to the plaintiff, *Lawson*, in the winter of 1875-6, as found by the court, and there would seem to be no reason why he should not recover in this action.

*By the Court.*— The judgment of the county court is affirmed.