The Fox River Flour and Paper Co. vs. Kelley and others.

See note to this case in 35 N. W. Rep. 733.— REP.

---

THE FOX RIVER FLOUR AND PAPER COMPANY, Respondent, vs. KELLEY and others, Appellants.

*November 26 — December 13, 1887.*

WATERCOURSES: EQUITY. *(1) Injunction to restrain use of water-power. (2, 3) Riparian rights: Dams: Artificial channel. (4) Estoppel by silence. (5) Grant by one having no title. (6) Adverse user.*

1. For the purpose of avoiding a multiplicity of suits equity will interfere by injunction to restrain the owner of a lot adjacent to a canal or mill-race which forms part of a system of hydraulic works owned by the plaintiff, from drawing water therefrom to operate a mill on such lot.

The Fox River Flour and Paper Co. vs. Kelley and others.

2. One who acquires title to land across which water runs in an artificial channel constructed for hydraulic purposes, does not by that mere fact acquire the right to draw water from such channel.

3. L. was the owner of blocks C and 14 in the city of Appleton, abutting on Fox river, which, with other lands, had been purchased for him by his agent, S., under an agreement that S. should have an equal interest in the profits of the adventure. L. constructed a wing dam and side dam in the river adjacent to block C, and also constructed a canal or mill-race from such dams, parallel with the river below, through a part of block C and also across block 14, which was situated lower down the river. By an agreement between L. and S., enforced by a decree of court, all of block C and the water-power and mill privileges upon the front thereof were set over to L. free from all equities of S.; and block 14 was divided between them, L. taking the odd-numbered lots, and S. the even-numbered lots. Nothing was said in the agreement or decree about hydraulic rights in connection with the lots in block 14. *Held*, that S. did not acquire any hydraulic power or privileges in the water-power as appurtenant to his lots in block 14.

4. Grantees of S. erected a factory on a lot in block 14 with the intention of operating it by water drawn from the canal. The grantees of L., who had water rights to sell or lease from the canal, knew that such factory was being built and permitted the work to go on without giving notice that said grantees of S. would have no right as such to use water from the canal. *Held*, that the grantees of L. were not thereby estopped to assert their rights.

5. After he had conveyed his title to the lot in block 14 above mentioned, S. subscribed towards the building of another dam for the improvement of the water-power. The improvement was made by a company which owned no land and issued no stock for the subscriptions. Most of the subscribers were persons interested in the power, but some had no object but the general good of the city. Afterwards the company quitclaimed to S. and others, owners of lots along the river, all its interest in the dam so built by it. *Held*, that the grantees of the lot above mentioned gained no right under the quitclaim from the company to S. to take water from the canal.

6. Mere words, unaccompanied by acts of ownership, will not amount to an adverse user.

APPEAL from the Circuit Court for *Outagamie* County. Action to restrain the defendants from using any water, parcel of a certain water-power on the Fox river, in hostility

to the title of the plaintiff, without leasing or purchasing the same from the plaintiff. The principal facts are stated in the opinion and will not be repeated here.

Shortly after the division of the lands between Amos A. Lawrence and Reeder Smith under the decree enforcing the agreement theretofore made between them, Anson Ballard, whose widows and heirs are referred to in the opinion, obtained title to all the lands and lots set off to Lawrence by such decree and the water-power and mill privileges upon the front of block C, so far as the same had not been sold or leased to others by Lawrence, and continued to own the same until his death in 1874. In November, 1883, the plaintiff acquired all the right of the widow, heirs or legatees of Ballard in the property.

On January 10, 1880, Reeder Smith conveyed to Eliza Kelley, lot 8 in block 14, with the water-power appurtenant thereto and all his privilege of taking water for hydraulic purposes from the canal; and by mesne conveyance that title came to the defendants. Soon after the purchase of said lot 8 from Reeder Smith, the defendants or their grantors built a woolen mill thereon and operated the same until this suit was commenced, taking water to run such mill from the canal, claiming that the right to take such water was appurtenant to the lot.

The circuit court held that by the division of the property between Lawrence and Smith all the water-power carried by the wing dam became the separate property of Lawrence, and that Smith got no hydraulic power or privileges as appurtenant to his lots in block 14; that by the conveyance from the Appleton Water-Power Company Smith got no water-power or privilege; and that the defendants have no right to draw water from the canal for hydraulic purposes. From the judgment entered accordingly in favor of the plaintiff, the defendants appealed.

For the appellants there was a brief by *H. D. Ryan* and

*Nash & Nash,* and oral argument by *Mr. L. J. Nash.* They contended, *inter alia:* (1) The plaintiff and its grantors were estopped to deny that Reeder Smith and his grantees were entitled to some water-power as appurtenant to the even-numbered lots in block 14. *Gove v. White,* 23 Wis. 282; *Rerick v. Kern,* 16 Am. Dec. 497; *Walker v. Flint,* 3 McCrary, 507; *Champlin v. Stoddart,* 30 Hun, 300; *Anderson v. Hubble,* 47 Am. Rep. 394; *Norris v. Mich. State Ins. Co.* 51 Mich. 621; *Pratt v. Lamson,* 2 Allen, 275; *Wetmore v. White,* 2 Caines' Cas. 87; *Henderson v. Overton,* 24 Am. Dec. 492. (2) The canal embankment was a part of the dam, and together with the wing-dam and side-dam constituted one entire hydraulic work intended to concentrate and localize all the riparian right of water fall appurtenant to the whole of blocks C and 14 upon the mill sites extending from the angle in the wing-dam and side-dam, along the side-dam and down to the foot of the canal; and there is no theory or fiction in the law allowing the whole water-power to the owner of the lot on which was originally located the landing of the side-dam, such landing having been removed and abandoned when the canal was constructed. See *People v. Gaige,* 23 Mich. 93; *Lawson v. Mowry,* 52 Wis. 219; *Kennedy v. Scovil,* 12 Conn. 317. (3) The construction of the canal was an open, visible, and permanent disposition of the material properties of the lots, adapting them to a particular purpose and rendering them wholly dependent upon the water-power of the canal for their reasonable use and enjoyment, preventing them from being used for any purpose except that to which they had thus been devoted, and rendering and keeping them of no practical value if cut off from an appurtenant or incidental right to draw water from the canal for hydraulic purposes. It was not necessary, therefore, that any mention of hydraulic power or other water rights should have been made in the deed to Reeder Smith. *Pickering v. Stapler,* 5 Serg.

& R. 107, 9 Am. Dec. 336; *Kutz v. McCune*, 22 Wis. 628; *Smith v. Hughes*, 50 id. 620; *Tabor v. Bradley*, 18 N. Y. 109; *Voorhees v. Burchard*, 55 id. 98; *Lampman v. Milks*, 21 id. 505; *Simmons v. Cloonan*, 47 id. 3; *Curtiss v. Ayrault*, id. 73; *Morgan v. Mason*, 20 Ohio, 401, 55 Am. Dec. 464; Angell on Watercourses, secs. 158–9, 161, 164*a*, 165, 166*c*, *h, i; Wall v. Cloud*, 3 Humph. 181; *New Ipswich W. L. Factory v. Batchelder*, 3 N. H. 190; *Seibert v. Levan*, 8 Pa. St. 383, 49 Am. Dec. 525 and note; *Bardwell v. Ames*, 22 Pick. 333; *Hammond v. Woodman*, 41 Me. 177, 66 Am. Dec. 219; *Pomeroy v. C. & M. R. Co.* 25 Wis. 641; Gould on Waters, sec. 225; *Thayer v. Payne*, 2 Cush. 327; *Prescott v. White*, 21 Pick. 341. (4) On September 25, 1850, Reeder Smith was equitably the owner of a half interest in block 14, and also of an equity in all the water-power above. On that day as one of the agents of Lawrence he entered into a contract with one Lamphear for the construction of the canal. He acted as agent because Lawrence held the entire legal title, but in equity that contract should be viewed as if entered into by Smith and Lawrence, the joint owners of the property, with Lamphear; that is, two men owning in common the whole of blocks C and 14 contracted for the construction of a canal (which was originally contemplated as part of one entire hydraulic work) upon their common lands for the purpose of converting the lands at the lower end of the tract into mill sites, and giving them the water-power and riparian rights appurtenant to the whole tract. Is it possible that either of the joint owners could have made that contract with the understanding that one of them was by the very digging of the ditch to acquire no new rights or benefits to his property, but was to have his share of the common lands defaced, rendered valueless of itself, and made subject to a servitude for the exclusive benefit of his co-owner? Clearly not. And this is made even more clear by the terms of the contract made November 23, 1850,

providing for a division of block 14. That contract excepted from the property to be divided certain water-power "upon the front of block C;" and it was entered into while Lamphear was at work under the construction contract of September 25. The exception of the water-power "upon the front of block C" clearly shows that both parties intended to divide between them block 14 with all such water rights as their previous dealings in relation to that block had entitled them to respectively, and with all such water rights as they had conferred upon block 14 for their mutual benefit by the construction of the canal. (5) But if the canal be regarded as an improvement placed upon block 14 by Lawrence alone, wholly upon his own motion, then we have the case of one tenant in common placing improvements upon the common lands; and a court of equity must regard such improvements as belonging to all the co-tenants. *Honzik v. Delaglise*, 65 Wis. 494; *Scott v. Gurnsey*, 48 N. Y. 106.

For the respondent there was a brief by *Moses Hooper*, and oral argument by *Mr. Hooper* and *F. W. Houghton*. To the point that under the facts of this case the defendants have no water-power as appurtenant to their lot or growing out of their ownership of the same, they cited *Lawson v. Mowry*, 52 Wis. 219; *Smith v. Ford*, 48 id. 116, 162, 168; *Wall v. Cloud*, 3 Humph. 181; *Parker v. Griswold*, 17 Conn. 288, 299, 300; *Tillotson v. Smith* 32 N. H. 90, 95; *Medway Co. v. Romney*, 9 C. B. (N. S.), 575; *Clark v. Brown*, 70 Iowa, 139.

COLE, C. J. The plaintiff claims to be the owner of all the unsold water-power created by a system of dams on the Fox river at Appleton, and has filed this bill in equity to restrain the defendants, who own a mill on the lot below, from diverting or using any water drawn from its said water-power. An objection was taken here by the learned

AUGUST TERM, 1887.        293

The Fox River Flour and Paper Co. vs. Kelley and others.

counsel for the defendants that the plaintiff had an effectual remedy at law, and that a court of equity should turn it over to that remedy where there could be a jury trial settling its rights in the water-power before granting the relief asked. The answer raises no such objection, and we think the facts stated in the complaint present a case for the interference of a court of equity, providing the plaintiff establishes its right to all the unsold residue of the power as it claims. It is plain that an action of trespass for every interference with its rights would lead to interminable litigation. And it is well settled that equity will interfere, by way of injunction, to restrain irreparable mischief, or to restrain oppressive and interminable litigation, or to prevent multiplicity of suits. 2 Story's Eq. Jur. §§ 925–927. The plaintiff's case may well stand upon that ground, even if a seasonable objection had been interposed.

This case involves questions relating to riparian rights; and it may be well, at the outset, to refer to some elementary doctrine which defines or states what these rights are. In *Head v. Amoskeag Mfg. Co.* 113 U. S. 9–23, Mr. Justice GRAY says: "The right to the use of running water is *publici juris*, and common to all the proprietors of the bed and banks of the stream from its source to its outlet. Each has a right to the reasonable use of the water as it flows past his land, not interfering with a like reasonable use by those above or below him. One reasonable use of the water is the use of the power inherent in the fall of the stream and the force of the current to drive mills. That power cannot be used without damming up the water and thereby causing it to flow back." In *Bates v. Weymouth Iron Co.* 8 Cush. 548–552, Chief Justice SHAW says: "The relative rights of land-owners and mill-owners are founded on the established rule of the common law that every proprietor through whose territory a current of water flows in its course towards the sea, has an equal right to the use of it

for all reasonable and beneficial purposes, including the power of such stream for driving mills, subject to a like reasonable and beneficial use by the proprietors above him and below him on the same stream. Consequently, no one can deprive another of his equal right and beneficial use by corrupting the stream, by wholly diverting it, or stopping it from the proprietor below him, or raise it artificially so as to cause it to flow back on the land of the proprietor above." Chancellor Kent says: "Every proprietor of lands on the banks of a river has naturally an equal right to the use of the water which flows in the stream adjacent to his lands, as it was wont to run *(currere solebat)*, without diminution or alteration. No proprietor has a right to the use of the water to the prejudice of other proprietors above or below him, unless he has a prior right to divert it, or a title to some exclusive enjoyment. He has no property in the water itself, but a simple usufruct while it passes along. *Aqua currit et debet currere ut currere solebat,* is the language of the law. Though he may use the water while it runs over his land as an incident to the land, he cannot unreasonably detain it or give it another direction, and he must return it to its ordinary channel when it leaves his estate. Without the consent of the adjoining proprietors, he cannot divert or diminish the quantity of water which would otherwise descend to the proprietors below, nor throw the water back upon the proprietors above, without a grant, or an uninterrupted enjoyment of twenty years, which is evidence of it." 3 Kent's Comm. *439. The authorities might be multiplied indefinitely which define the right in substantially the same language, but it is unnecessary. In *Lawson v. Mowry*, 52 Wis. 219, the same doctrine is recognized and applied, and many cases cited which enforce it.

Applying this doctrine to the case before us, and it is plain that in the absence of any grant, or of a title acquired by adverse user, the defendants as riparian proprietors only

have the right to the natural flow of the water of the river by their lot; also, as incident to their ownership of the lot, they have the right to utilize any fall in the stream in its natural state, as it passes by their lot, for the purpose of a water-power. This is the full extent of their rights as riparian proprietors owning the lot on the river below the water-power. But it is claimed by their counsel that, upon the facts disclosed in the evidence, the defendants took, as incident or appurtenant to their lot, the right to use water from the hydraulic power which had been created on the river; and this is the real point in controversy.

It is impossible, within any reasonable limits, to make a full statement of the facts upon which the defendants base this right. It must suffice to say that the evidence shows that in 1849 Mr. Amos A. Lawrence was the owner of a part of the site of the city of Appleton, which had been purchased for him by Mr. Reeder Smith, who acted as his agent in making such purchases, under an agreement that he was to have an equal interest in the profits of the adventure as compensation for his services in purchasing and looking after the property. A part of the property lay along the north bank of Fox river; and this was, in 1850, platted into blocks A, B, C, and D, and these blocks into about a hundred lots. Block C lay along the river, between the westerly line of the Appleton plat and Morrison street, and was divided into lots, which were numbered from one, the westerly line of the block, to twenty-six, at the easterly end at Morrison street, and was bounded on the north by Water street. In 1849, Lawrence commenced the construction of a wing-dam and side-dam, which rested upon the bank of the river on lot 18 of block C, at a point about 160 feet above the east line of the lot as platted on McKelcon's map, which is mentioned in the evidence, and 400 feet or more above or west of the east line of block C. This wing-dam and side-dam was completed in 1850, and created a mill-pond or

water-power on block C. In the fall of 1850, Lawrence commenced the construction of a mill-race or canal leading from the shore end of the wing-dam down the river, nearly parallel with the bank, and opening at the west end into the mill-pond. In 1851, this canal or raceway had been constructed by Lawrence from the mill-pond down to Drew street, and across twelve lots which constituted block 14. From the time of the completion of the canal until now, the wing-dam and southern bank of the canal have all been maintained,— the water of the mill-pond communicating with the raceway,— and all held and maintained for the purpose of creating a water-power. On or before November, 1850, Smith and Lawrence entered into an agreement for a division of the unsold land at and near Appleton, of which Smith was to have an equal interest in the profits. By this agreement a division was provided for, and which was ultimately carried out by a decree of the court. The lands and the lots contained in the McKelcon plat, and the land in front of that plat, covered by the waters of the Fox river, and the water-power and mill privileges on the river in front of the lots and blocks in the said McKelcon plat, were set over to Lawrence, free from any claim by Smith. Lawrence thus, by this division, became the sole owner of the property just mentioned, free from all equities which Smith had had in it. Block 14 contained twelve lots, and, under the decree, was divided between Smith and Lawrence; Smith taking the even-numbered lots, and Lawrence the odd-numbered. The defendants own lot 8, deriving title from Smith as their remote grantor. The plaintiff claims under Lawrence as its remote grantor, and owns the wing-dam, the side-dam, the dam-landing, and the land, including the mill-race and the land between it and the river, from the dam-landing about 400 feet to block 14; also the alternate odd-numbered lots in block 14 from this point down to defendant's lot, excepting some small parcels sold by plaintiff

The Fox River Flour and Paper Co. vs. Kelley and others.

or its grantors, with specified quantities of water to be used with each parcel. Lot 8 lies about 900 feet below the dam-landing, and reaches entirely across the mill-race and to and into Fox river, so that water can be and is drawn from the canal and discharged into the river without going off lot 8. The mill-race or canal extends down the river from the dam-landing some 1,200 feet.[1]

[1] The above map is copied from Stephens' map of Appleton made in 1872, and shows blocks C and 14, with some contiguous blocks and streets. Block C as here shown is identical with block C on McKelcon's

This statement of facts is sufficient to render our remarks intelligible. It will be seen that the plaintiff has become the owner of the dam, and of the land where it abuts on the bank, and of whatever creates the hydraulic power; and we are unable to perceive upon what principle or ground the defendants can claim the right to draw, from this power, water for driving their mill or factory situated on a lot 900 feet below the power itself. We have already said, as riparian proprietors they were doubtless entitled to the flow of the water in its channel and to its reasonable enjoyment as it passes through their lot, as a natural incident to the ownership. But how do they acquire any hydraulic power as appurtenant to their lot because the raceway or canal — an artificial channel — passes through it? This is a proposition which we are unable to understand. The raceway or canal was made by Lawrence at his own expense, and presumably for his own benefit. He owned the water-power made by the dam above as his own property. This is very clear from the agreement which the parties made in November, 1850, as well as by the decree of the court enforcing a performance of that contract. The language of the contract is, in effect, that the 100 lots included in the plat of the village made by McKelcon, the land bordering thereon which is covered by the waters of Fox river, to which the owner of said 100 lots then had, or may hereafter have, a right of possession or property, either as an abutter or by virtue of any grant theretofore made, " and the water-power and mill privileges on Fox river upon the front of said lots; which 100

map, mentioned in the opinion. The canal in block 14 is not shown in its full length, but is represented as extending only through lot 4, though it in fact extends through the entire block.

The map shows also, by dotted lines, a replat of the lands between the river and the canal, from the side-dam eastward to Drew street.

As introduced in evidence, the map did not show the dam of the Appleton Water Power Company, west of the bridge, but this has been added for better information.— REP.

*lots, flowed lands, water-power, and mill privileges*" shall thereafter be held and owned as the individual property of Lawrence. Nothing whatever is said about the owners of lots in block 14 having a right or interest in this power. It is most extraordinary if the parties understood or had any idea that the owners of lots on block 14 would take, as appurtenant to their lots, hydraulic rights in the water-power, that so important a matter was entirely omitted. There is no mention of such a right in the contract or decree. It is true, in November, 1850, block 14 belonged to Lawrence, subject to the equitable rights of Smith. It is likewise true that at this time Lamphear was engaged in cutting the raceway or canal, evidently for the purpose of utilizing the water-power which had been created along that artificial channel. But Lawrence entered into no obligation to construct that raceway for the benefit of block 14, or any other property; and defendants' counsel admits that it was entirely at his option to construct it or not. But still it is a significant fact that nothing is said upon that subject in the contract, nor is any mention of hydraulic rights made in the deed. We therefore entirely concur in the view of the court below that by the arrangement for a division of the property which was made by the parties in November, 1850, or prior to that time, there was set off to Lawrence the 100 lots in blocks A, B, C, and D, according to the McKelcon plat, with the riparian rights, and all the water-power created by the system of dams abutting on block C, as his separate property, free from all claims of Smith; and by this division Smith did not get, nor was he intended to have, any hydraulic power or privileges in this water-power as appurtenant to any lot in block 14 which might be set off to him. We do not see how any other conclusion can be reached upon the facts. There is surely nothing in the circumstances attending the construction of the raceway or canal which will warrant the inference that

Lawrence intended to give Smith the right to draw water from it to drive mills upon any lots which he might subsequently acquire on the division of the unsold property.

The courts hold that the right to the water of a river flowing in a natural channel through a man's land, and the right to water flowing to it through an artificial watercourse constructed on his neighbor's land, do not stand upon the same ground. *Greatrex v. Hayward*, 8 Exch. 291; *Wood v. Waud*, 3 Exch. 748; *Mugor v. Chadwick*, 11 Adol. & E. 571; *Sutclife v. Booth*, 32 Law J. Q. B. 136; *Rameshur Pershad Narain Singh v. Koonj Behari Pattuk*, 31 Moak, 771, 33 Moak, 91. In the former case, each riparian proprietor *prima facie* is entitled to the unimpeded flow of the water in its natural channel, while in the latter case any right to the flow must rest on some grant or arrangement, either proven or presumed, from or with the owner of the land from which the water is artificially brought, or on some other legal origin. 31 Moak, 776. Defendants' counsel claims that the case stands upon the same principle as *Pickering v. Stapler*, 5 Serg. & R. 107, 9 Am. Dec. 336; *Tabor v. Bradley*, 18 N. Y. 109; *Voorhees v. Burchard*, 55 N. Y. 98; *Lampman v. Milks*, 21 N. Y. 505, and cases of that character. But we think there is a clear distinction between them. Where one sells land upon which there is a mill, he may well be presumed to sell the water-power used to drive the mill, though the deed does not mention such water-power. The power goes as an appurtenance to the estate or thing conveyed. *Kutz v. McCune*, 22 Wis. 628; *Curtiss v. Ayrault*, 47 N. Y. 73, go upon the same ground,— that a purchaser of property which is subject to an obvious physical easement is presumed to contract with reference to its condition when he purchased. None of these cases seem to have a very direct bearing upon the question we are considering. But surely not one of them in the least sustains the defendants' right to draw water

from the raceway, merely because such raceway happens to cross their lot; for their right, if they have it, must rest upon that ground. As we have said, the raceway was made by Lawrence at his own expense, presumably for his own benefit, in order to furnish water privileges to persons operating mills below the power. As was said in *Lawson v. Mowry*, 52 Wis. 219, it is common to conduct water from a pond created by a dam by means of artificial channels in order to make available the increase of the head by reason of the additional fall in the bed of the stream below the dam. It is also common to conduct, by such channels, water from a power created by a dam, to places below, where it can be utilized to drive mills. It is unreasonable to suppose that Lawrence, when he constructed this raceway, expected that every person who owned a lot abutting it would have a right to draw from it whatever water he could use on his lot, without paying for it. The record shows that leases and sales of given quantities of water from the dam were made to various persons. The fact that such sales and leases could be made, rendered the water-power valuable. Stress is laid upon the circumstance that this raceway was constructed before the lots in block 14 were divided, and that one principal object in making it was to give those lots the advantage of a water-power. Assume that this is according to the fact, still it does not follow that the owners of lots on block 14 were to have the right to take whatever water they might need from the raceway free. It would be absurd to entertain such a supposition. When the raceway was constructed, it was not known who would own lots on block 14. That block had not then been platted, and no arrangement had been made for a division of them between Lawrence and Smith.

Upon the facts, we see no ground for presuming a grant to Smith of a right to use water from the raceway free, and of course the defendants have no such right. If they have

that right, what is the extent of it? Is it unlimited to use all they need or can utilize on the lot? If so, what are the rights of other proprietors who own lots abutting the race-way? Have they the same right to take from the raceway whatever water they need or can utilize? Suppose the power is not sufficient to supply all who need water, how are their conflicting rights to be adjusted? These obvious diffi-culties strengthen the conclusion that no implied grant of the right to take water from the raceway exists or was given as an appurtenance to lot 8. All the facts and cir-cumstances tend to disprove such a right or such a grant.

Is there any ground for saying such a right has been ac-quired by adverse enjoyment? We think not. It is true Mr. Smith says he always claimed and asserted that he had such hydraulic rights by virtue of his ownership of lot 8. He doubtless had forgotten the answer he made to the cross-bill in the equity suit, in which he stated that he had no interest in the property to be benefited by the expenditure made by Lawrence in constructing the water-power, in-cluding the raceway. But, if Smith claimed the right to draw the water from the raceway, he did no act to make that claim good, or which the owners of hostile interests were bound to contest, before he parted with the title. Mere words, not accompanied with acts of ownership, would not amount to adverse user or enjoyment. We do not un-derstand that any attempt was made to draw water from the raceway to use on lot 8 until 1879, and then it was re-sisted by the administrator of the Ballard estate, who repre-sented a hostile right.

But we need not dwell upon this point, which has really no support in the proofs. On the contrary, the evidence fully justifies the conclusion that Smith knew very well that the water-power created by the dam belonged to Lawrence and those claiming under him, and that the own-ership of a lot on block 14 did not carry, as appurtenant

to it, any hydraulic power, without special mention of such power.

Nor do we think that the plaintiff has lost any right, or that the defendants have gained any equities, because they have made improvements on the lot without being informed as to the extent of their right to draw water from the race-way. The argument is that they have expended $3,000 or $4,000 in building a factory on the lot, acting under the impression that they had the right to draw water from the raceway to operate it; and that those owning the residue of the water-power did not disabuse their minds of that impression, as good faith required. Upon that point the court found as follows: That the widow and most of the heirs of Anson Ballard lived in sight of lot 8 from the time of his death, in 1874, until now; that the defendants and those under whom they claim purchased said lot for the purpose of building a factory thereon and running the same by water from said canal, and had no notice served upon them by the widow or heirs of Anson Ballard or the plaintiff that their right to use water from said canal for hydraulic purposes was disputed, until shortly after the plaintiff purchased said property from the widow and heirs, in November, 1883, when the defendants were notified by the plaintiff that it denied the defendants' right to use such water unless they leased the same from the plaintiff; and the defendants had no other notice that their right to take water from the said canal was or would be disputed, except such as was common to all men in the public records of the county as to the claim of title to the property.

Suppose the widow and heirs of Ballard did stand by and see the defendants building their factory, had they not the right to presume that the defendants would lease or buy what water they might need to operate it? They had water-rights to sell and lease, and they might well desire to see preparations made for using such water-power. Be-

sides, it is a fair inference that the widow and heirs did not fully understand what the rights or claims of the defendants were as to the water-power. Consequently, we think that the facts do not show that the Ballard heirs lost any right by delay, or that they can be held to have acquiesced in the claim which the defendants now make of their right to use water from the raceway. There is no ground for an equitable estoppel, nor any reason for imputing fraudulent silence to the widow and heirs in allowing the new factory to be built without giving notice of their rights.

The only remaining question which we shall consider relates to the interest in the water-power which Smith acquired under the deed of the Appleton Water-Power Company. From the proofs before us, it is difficult to define what interest, if any, that company had to convey to any one. It never owned any land, nor did it issue any stock for subscriptions; still it raised more than $9,000 by subscriptions,— the greater part from persons who were interested in the water-power,— and these funds were expended in building a dam across the river to the south shore, just below the original wing-dam. The evidence clearly shows that the subscribers did not expect the company would derive any direct benefit from the money expended to improve the water-power, or that it acquired any rights in the power by the expenditure made. The object of the association, said one witness, was to improve the water-power for the men who owned it. They had a direct interest in creating the dam, and doing away with the wing-dam then used. The other subscribers had no object except the general good of the city. It is therefore difficult to tell what interest, if any, the corporation had in the water-power. It certainly did not claim any hydraulic rights therein. Mr. Smith subscribed $200; several others subscribed as much who had no interest whatever in the water-power, and claimed none. After the expenditure of the subscriptions, the company quitclaimed

to Smith and others, owners of lots on the north bank of the river, all its right, title, and interest in the dam it had constructed, and in the bulk-head and crib connected therewith. It is possible that this deed transferred some equity in the water-power, but it is not easy to say what it was. It was an undefined and intangible interest at best. But, at all events, this deed to Smith was made after he had conveyed his title to lot 8 by the deed under which the defendants claim. So, in any view, we cannot see that the defendants' rights in the water-power were or can be strengthened by the deed made by the Appleton Water-Power Company to Smith, whatever effect that instrument may have.

It follows from these views that the judgment of the circuit court must be affirmed.

*By the Court.*— Judgment affirmed.

---

THE FOX RIVER FLOUR AND PAPER COMPANY, Appellant, vs. KELLEY and others, Respondents.

*November 26 — December 13, 1887.*