The Falls Mfg. Co. vs. Oconto River Imp. Co. and others.

aught that appears in the record, the respective partners may have had individual property sufficient to satisfy any and all claims for exemptions.

*By the Court.*— The order of the circuit court is affirmed.

THE FALLS MANUFACTURING COMPANY, Appellant, vs. OCONTO RIVER IMPROVEMENT COMPANY and others, Respondents.

*February 3 — February 23, 1894.*

Navigable rivers: Log driving: Flooding dams: Rights of mill dam owners.

1. A stream which, in its natural state, is capable of floating logs to market during the spring freshets, which usually last about six weeks, is a public navigable waterway for the transportation of logs and timber, although during the remainder of the year it is not practically useful for such purpose without the aid of flooding dams.

2. The legislature may authorize the construction of flooding dams in such a stream, in aid of navigation; and the owners of mill dams built across the stream under prior statutory authority have no right of action for any impairment of the efficiency of their water powers resulting from the proper use of such flooding dams.

APPEAL from the Circuit Court for *Oconto* County.

This action was commenced September 28, 1891, to perpetually restrain the defendants from interfering with or interrupting the natural flow of the Oconto river at the plaintiff's pulp mill and mill dam, so as to impair the usefulness of its water power, and for $15,000 damages already caused in 1891, prior to the commencement of this action, by the wrongful acts complained of, and such damages as should accrue thereafter during the pendency of this suit, and for costs. The answer consists of admissions, denials,

and counter allegations, and justifies under certain acts of the legislature of this state. At the close of the trial the court found, as matters of fact, in effect:

1. That the Oconto river, from its mouth to the junction of its north and south branches, a distance of fifty miles, is a meandered stream of the average width of 100 feet. That its branches were said north and south branches, the Waupee and McCauslin's brook, which flow into the north branch, Peshtigo brook, which flows into the main river just below the junction, and Little river, which flows into the main river below Stiles. That the city of Oconto is situated near the mouth of the main river; that Stiles is ten miles above the mouth of the river. That Oconto Falls, where the plaintiff's mills and dams are situated, is about sixteen miles above said mouth. That Flat Rock dam, owned and operated by the defendants, is about thirty miles above the mouth of the river, and twenty miles below the junction.

2. That the Oconto river and its branches are subject to fluctuations in the height and volume of water. That there is a period of high water or freshet on said stream and its tributaries each spring, lasting ordinarily from about the middle of April to about June 1st. That, in addition to such freshets, there is usually a rise of water in June, and occasionally in September, which are much less in extent than the spring freshets, and last only about two weeks.

3. That the average natural flow from the junction of the north and south branches to the mouth of the river, during spring freshets, is from 85,000 to 100,000 cubic feet of water per minute. That an ordinary stage, when there are no freshets, is about 25,000 to 30,000 cubic feet per minute. That during extreme low water, such as occurs once or twice in a lifetime, and did in 1891, it is about from 13,000 to 16,000 cubic feet per minute. That the natural flow fluctuates above and below said quantities, and during November, 1891, it so fluctuated from about 13,000 to 23,000 cubic feet

per minute, and the average flow was about 20,000 cubic feet per minute.

4. That in its natural state, without the aid of dams, said river had a capacity to usefully and profitably transport on its waters from the junction to its mouth, during the spring freshets, about 20,000,000 feet of timber annually. That in said distance there are various rapids and places of shoal water, over which logs will not float without help in the natural state of the river, save during freshets. That there are other places where the smaller logs will float at ordinary or low stages of the water for short distances, but such places are not of sufficient length to make the river practicably navigable for log driving during such stages, without floods. That such June and September freshets are not of sufficient volume or duration, in the natural state of the river, to float logs to any considerable extent, but are sufficient to float them to some extent with the aid of wing dams, horses, and other devices used by log drivers, but are not usually sufficient to render the stream practically navigable for logs during their continuance, without the aid of flooding dams.

5. That by their natural flow only at least 20,000,000 feet of logs, in the aggregate, can be naturally floated down the north and south branches, Waupee, and Peshtigo brook, into said river below the junction, during the spring freshets; but no logs can be thus floated down McCauslin's brook without the use of dams. That logs can thus be floated down the north branch at least twenty or thirty miles, said south branch twelve or fifteen miles, said Waupee two or three miles, and said Peshtigo brook twenty-five miles. That logs can be floated down said south branch to below the junction, by the natural flow only, at ordinary stages of water, a distance of about twelve miles, with the aid of wing dams, temporary dams, and assistance from log drivers working on the logs in the stream. That

it would be possible at such stages, by such means, to drive some of the smaller logs from the junction to the mouth of the river, but such driving could not be done with any profit to the log owners.

6. That, prior to log driving on the river, there were tributary to it and its branches about 3,000,000,000 feet of pine timber, and a large quantity of other floatable timber. That about 2,900,000,000 feet of pine were above the plaintiff's mills at Oconto Falls, and about 2,700,000,000 feet above the defendant's structures at Flat Rock dam.

7. That in 1851 about 1,000,000 feet of pine logs were driven down the Oconto from above Flat Rock dam and near the junction to the city of Oconto, during the spring freshet, without the aid of improvements. That from 1851 the quantity thus driven without such aid between said points increased from year to year to about 25,000,000 feet in 1858 or 1859. That about 1859 private parties began to build flooding dams on said branches above the junction, to facilitate the driving of logs down the same and down the river from the junction after the spring freshets were over, whereby the natural capacity of the stream and its branches was increased so that by 1866, and thence to 1872, from 60,000,000 to 75,000,000 feet of logs were annually driven down the river from above Flat Rock dam to Stiles and the city of Oconto.

8. That, in the early years of log driving on the river, most of the logs were put in between Oconto Falls, where the plaintiff's mills are situated, and the junction, or within a short distance above the junction, and were largely driven down the river to their destination, near its mouth, on the spring freshets. That, as logging operations extended up said branches, the proportion of logs floated down the river from above the junction increased until now, when most of said logs come from above the junction; and, as such proportion so increased, more and more of said logs came

into the main river later in the season, and too late to get the benefit, or full benefit, of the spring freshets, until now, when but a small part, if any, of the logs get below the junction in time for such freshets. That, as the proportion of logs thus coming to the main stream too late for the spring freshets increased, the necessity for increased facilities for floating them down the stream became greater, and for that purpose, from about 1860 until 1872, a flooding dam, known as the "Chute Dam," was built about twenty-five miles above said junction, on and across said north branch, and was used. That about two thirds of the water passing at Oconto Falls, where the plaintiff's mills are situated, comes into the river below said Chute dam.

9. That Flat Rock dam was built in 1872, and is a flooding dam, and used by storing the water of the river in its pond, which, when full, holds about 300 acres, and discharging the same in greater quantities than the natural flow when there are no freshets to aid in driving logs and timber down the stream, and in sorting, handling, and delivering logs below the dam. That such dams are the usual means of driving logs on logging streams of northern Wisconsin. That the Flat Rock dam has been so used each year since 1872, such use beginning after the spring freshets, and continuing, whenever the natural flow was insufficient to drive logs, until the river froze in the fall. That in such use the discharge of stored water is called the "running of heads." That they are ordinarily run daily, but sometimes oftener, and sometimes once in two days, depending upon the adequacy of the natural flow to create sufficient heads for driving. In running heads, the gates of the dams are raised from six to ten hours, and then closed until the next head is run. That heads reach Oconto Falls in about four hours, and increase the natural level of the water there from one to three feet, or, at their highest point, to about the ordinary level of the spring freshet. That the increase at Oconto

Falls is wholly within the banks of the river, and continues for about the time the gates at Flat Rock dam are open to run the head. That while said gates are closed between heads the flow at Oconto Falls greatly decreases until it is much less than the natural flow, and during the year 1891 it was at times less than 3,000 cubic feet per minute.

10. That Flat Rock dam was built by the *Northwestern Improvement Company*, under ch. 363, P. & L. Laws of 1869. That said improvement company, about the year 1869, took possession of, and maintained and operated until the year 1891, the dams and improvements existing on said branches prior to 1869, built other dams besides the Flat Rock dam, and spent large sums of money therein and in otherwise improving said river and its branches, to facilitate the driving of logs therein. That Flat Rock dam was so used, in conjunction with other improvements, from 1872 to 1892, and thereby the natural capacity of said stream was so increased that from 60,000,000 to 75,000,000 feet of logs have been driven down said river and its branches annually since 1872.

13. That there still remain on the river and its branches, above Flat Rock dam, 500,000,000 feet of pine and 300,000,000 feet of other timber, all tributary to the river and its branches. That flooding dams, used as such Flat Rock dam was and is used, are necessary to make the transportation of logs and timber down said river practicable after the subsidence of the spring freshets.

14. That it is customary to use said Flat Rock dam to repeat the floods created by heads from the dams on the tributaries on the Oconto river above Flat Rock dam, in the running of logs from said Flat Rock dam past the plaintiff's mills, and to the mill slides of the several saw-mills at the city of Oconto, and it was so used in 1891 and 1892.

19. That while Volk was running said mill, prior to 1885,

the defendant *The Northwestern Improvement Company* did a large amount of blasting in the falls at Oconto Falls, constituting, in part, said water power, to facilitate the passage of logs over said falls. That said Volk made no objection to said blasting and improvement.

20. That April, 1884, the plaintiff became the owner of a one-half interest in the Volk dam. That in 1888 the plaintiff acquired the whole interest in that dam and water power, and owns numerous mills constructed thereon before the commencement of this action.

21. That before the plaintiff purchased any interest in the water power it knew that the river was a log-driving stream; and before it built its first mill it knew that, in driving, its natural flow at Oconto Falls was interfered with by flooding dams, substantially as it had been since 1872 and was in 1891 and 1892, and it built each of said mills with such knowledge.

22. That from 1885 to 1891 the plaintiff complained, from time to time, to individual directors of the defendant *The Northwestern Improvement Company*, that the use of the Flat Rock dam interfered with the use of its water power, and in 1891 made similar complaint to the *Oconto River Improvement Company*.

26. That the value of the plaintiff's water power plant is about $200,000.

31. That the interruption of the plaintiff's business, caused by the running of said heads, was a damage of $2,500 in 1891, and $500 in 1892.

As conclusions of law the court found, in effect, that the Oconto river is a navigable stream and a public highway for the transportation of logs and timber from above Flat Rock dam to its mouth; that Flat Rock dam is an authorized means for the improvement of said navigation, and the *Oconto River Improvement Company* had the right to use it as it did in 1891 and 1892, paramount to the plaintiff's

right to hydraulic power; that the defendants are entitled
to judgment dismissing the plaintiff's complaint, with costs.

From the judgment entered accordingly, August 29, 1893,
dismissing the complaint with costs, the plaintiff appeals.

For the appellant there was a brief by *Hooper & Hooper*,
and oral argument by *Moses Hooper*. They assigned as
error the conclusion that a river, floatable only for sawlogs,
and that only during a six weeks spring freshet, is a public
river, in such sense that any log-driving company may so
manipulate it, for the purpose of washing logs along its
bed, during the period of non-navigability, as to render
practically valueless the water power property of the ri-
parian owner. The rights of the log driver and the ripa-
rian owner on such streams are neither of them exclusive.
They are correlative, and, so far as involved in this case,
seem to be these: (1) The log driver has the right of pas-
sage. To that the riparian owner must cause no substan-
tial impairment. (2) The log driver, enjoying this right
of unimpaired passage, must not cause substantial im-
pairment of the hydraulic power of the riparian owner.
(3) Subject to the right of the riparian owner to enjoy his
hydraulic power, the log driver may swell and shrink the
stream at his pleasure, within the natural banks, in aid of
floatage. This court has not directly decided the point at
issue; but it has used language in two cases which seems
to indicate its opinion. *Miller v. Sherry*, 65 Wis. 129, 133;
*A. C. Conn Co. v. Little Suamico L. M. Co.* 74 id. 652, 656,
658. See, also, *Woodman v. Kilbourn M. Co.* 1 Biss. 546;
Black's Pomeroy, Water Rights, sec. 227, note 74. These
decisions seem to be in line with the settled policy of leg-
islation in Wisconsin. Of the hundreds of charters granted
by the state for water power dams, practically all recog-
nize the log driver's superior right to passage, while none,
except two — ch. 241, Laws of 1891, and ch. 143, Laws of
1893,— in any way subject the right of the riparian owner

The Falls Mfg. Co. vs. Oconto River Imp. Co. and others.

of water power to any other right of the log driver than his right to passage. The supreme court of Michigan has five times decided the precise point at issue in this case. *Middleton v. Flat River B. Co.* 27 Mich. 533–6; *Thunder Bay R. B. Co. v. Speechley*, 31 id. 336, 342–5; *Buchanan v. Grand River L. Co.* 48 id. 364; *Woodin v. Wentworth*, 57 id. 278, 282; *Koopman v. Blodgett*, 70 id. 610, 616, 617. See, also, *Grand Rapids B. Co. v. Jarvis*, 30 Mich. 308, 315, *et seq.; Bauman v. Pere Marquette B. Co.* 66 id. 544; *Witherell v. Muskegon B. Co.* 68 id. 48, 58–9; *Sterling v. Jackson*, 69 id. 488, 511, 512; *Grand Rapids v. Powers*, 89 id. 94, 111. In Maine, see *Lancey v. Clifford*, 54 Me. 487, 490–1; *Pearson v. Rolfe*, 76 id. 380, 385–7; *Foster v. Searsport S. & B. Co.* 79 id. 508; *Stratton v. Currier*, 81 id. 497, 504–5. In New Hampshire, see *Thompson v. Androscoggin R. Imp. Co.* 58 N. H. 108, 110, 111; *S. C.* 54 id. 545, 558–9; *Connecticut R. L. Co. v. Olcott Falls Co.* 65 id. 290, 384–5, 392; *Rindge v. Sargent*, 64 id. 294, 460–1; *Great Falls Mfg. Co. v. Fernald*, 47 id. 444, 457–8. The decisions in other states, as to the relative rights of log drivers and mill owners on floatable streams, establish the same proposition. *Morgan v. King*, 18 Barb. 277, 288–9; *S. C.* 35 N. Y. 454; *Chenango Bridge Co. v. Paige*, 83 id. 178, 185; *Barclay R. & C. Co. v. Ingham*, 36 Pa. St. 194, 201–2; *Newbold v. Mead*, 57 id. 487, 491–2; *Snow v. Parsons*, 28 Vt. 464. The learned writers of treatises upon the rights of riparian owners in water reach the same conclusion. Gould, Waters, secs. 110, 204; Ray, Neg. of Imp. Duties, Personal, sec. 45, pp. 402–3, 412–13; sec. 66, pp. 523–4; sec. 74, pp. 549, 550. The attitude of the Canadian courts is plainly indicated in *Esson v. McMaster*, 1 Kerr (N. B.), 501; *Rowe v. Titus*, 1 Allen (N. B.), 326.

For the respondents there was a brief by *Greene & Vroman*, and oral argument by *Geo. G. Greene.* They argued, among other things, that the respondents have the right,

paramount to appellant's water power right, to regulate
the flow of the river by using the Flat Rock dam for log
driving.  In this state, any stream capable by nature of
beneficial use for floating logs is a public highway, although
the stream is thus navigable only in yearly freshets,
and human aid is *then* necessary to continuous floatage.
*Whistler v. Wilkinson*, 22 Wis. 546; *Olson v. Merrill*, 42 id.
203; *Sellers v. Union L. Co.* 39 id. 526; *Weatherby v. Meikle-
john*, 56 id. 76; *J. S. Keator L. Co. v. St. Croix B. Corp.* 72
id. 62.  For forty years the policy of this state has thus
fixed the legal status of such streams.  From 1850 it was
enforced each year by special acts, until it was applied uni-
versally by ch. 399, Laws of 1876 (sec. 1777, R. S.).  The
improvement of these streams for log driving, under such
legislation, is *by the state.*  *Wis. R. Imp. Co. v. Manson*, 43
Wis. 265; *Cohn v. Wausau B. Co.* 47 id. 324; *Black R.
Imp. Co. v. La Crosse B. & T. Co.* 54 id. 682–5; *Underwood
L. Co. v. Pelican B. Co.* 76 id. 85; *Transportation Co. v.
Chicago*, 99 U. S. 635; *Genesee Fork Imp. Co. v. Ives,* 144
Pa. St. 114.  The Flat Rock dam is a "flooding dam," and
the usual means of driving logs on such streams.  The court
judicially notices the generality and necessity of the use of
such dams.  *Black River F. D. Asso. v. Ketchum*, 54 Wis.
316; *Field v. Apple River L. D. Co.* 67 id. 573; *Miller v.
Sherry*, 65 id. 129; *Tewksbury v. Schulenberg*, 41 id. 584–593.
Since the Flat Rock dam is an improvement of this public
highway by the state, riparian rights in the flow of the
stream are subject to its control, within its banks, by the
use of the dam, without compensation.  *Stevens Point B.
Co. v. Reilly*, 46 Wis. 237; *Cohn v. Wausau B. Co.* 47 id.
324; *Black R. Imp. Co. v. La Crosse B. & T. Co.* 54 id. 659; ·
*Field v. Apple River L. D. Co.* 67 id. 569; *J. S. Keator L.
Co. v. St. Croix B. Corp.* 72 id. 81, 82; *Black River F. D.
Asso. v. Ketchum*, 54 id. 316; *Green v. Swift*, 47 Cal. 536;
*Transportation Co. v. Chicago*, 99 U. S. 635; *Canal Ap-*

*praisers v. People,* 17 Wend. 571; *McKeen v. Delaware D. C. Co.* 49 Pa. St. 424; *Monongahela Nav. Co. v. Coon,* 6 id. 383; *Holyoke W. P. Co. v. Connecticut R. Co.* 20 Fed. Rep. 71. The authorities cited by appellant are of two classes: (1) Those which this court has considered and refused to follow. (2) Those which do not touch the question here involved. An individual navigator cannot obstruct, divert, or change the flow without liability for injury to the riparian owner. But the state may. This is held by the courts of every state whose decisions are cited by appellant, save Michigan. See *Brooks v. Cedar Brook & S. C. R. Imp. Co.* 82 Me. 17; *McKeen v. Delaware D. C. Co.* 49 Pa. St. 439; *Spangler's Appeal,* 64 id. 387; *Monongahela Nav. Co. v. Coon,* 6 id. 383; *People ex rel. Loomis v. Canal Appraisers,* 33 N. Y. 461, 500; *Smith v. Rochester,* 92 id. 464.

The charters to build or maintain dams on these streams, for hydraulic power, do not affect the powers granted to regulate their flow in aid of navigation. They were mostly granted while the regulations for navigation were in force. They uniformly recognize and guard the paramount right of navigation, by prescribing that the passage of logs and rafts must not be obstructed. This means the passage of rafts and logs that demand passage *under the regulation of the highway by the state.* The legislature could not surrender or fetter the power to regulate or improve these highways. It is part of the police power. Cooley, Const. Lim. 704, 726, 728; *Green v. Swift,* 47 Cal. 536; *Zimmerman v. Union C. Co.* 1 Watts & S. 346; *Comm. v. Alger,* 7 Cush. 53, 84, 97; *People v. Budd,* 117 N. Y. 1; *Jamieson v. Indiana Nat. G. & O. Co.* 128 Ind. 555. Such a power cannot be impaired by grants to individuals or corporations. Cooley, Const. Lim. 340 *et seq.,* 706, 728–730; *Smith v. Rochester,* 92 N. Y. 463; *American R. Tel. Co. v. Hess,* 125 id. 641; *People v. Squire,* 107 id. 593; *McKeen v. Delaware D. C. Co.* 49 Pa. St. 424; *Dingman v. People,* 51 Ill.

The Falls Mfg. Co. vs. Oconto River Imp. Co. and others.

277; *Toledo, W. & W. R. Co. v. Jacksonville,* 67 id. 37; *Moore v. Indianapolis,* 120 Ind. 483; *Metrop. Board of Excise v. Barrie,* 34 N. Y. 657; *Thorp v. R. & B. R. Co.* 27 Vt. 140; *Monongahela Nav. Co. v. Coons,* 6 Watts & S. 101; *Susquehanna C. Co. v. Wright,* 9 id. 9; *Union C. Co. v. Landis,* 9 Watts, 228; *Bailey v. P., W. & B. R. Co.* 4 Har. (Del.), 389; *Lonergan v. Miss. Riv. B. Co.* 2 McCrary, 451; *Miss. Riv. B. Co. v. Lonergan,* 91 Ill. 508.

CASSODAY, J. This case comes before us upon the findings of the court, and so there is no dispute about the facts. The plaintiff's mill dam and manufacturing plant were constructed under legislative authority, and are of great value. They are situated sixteen miles above the mouth of the river, and have always been used exclusively for manufacturing purposes. The statutes authorizing the same have at all times required the proprietor to maintain in the dam a chute or slide sufficiently deep and wide to allow the passage of logs coming down the river. The same is true of other dams above and below the plaintiff's dam, owned by those not parties to this action. One of such dams is situated six miles below the plaintiff's, and has been used, in part, for flooding purposes to aid in driving logs on the river. In 1867 the legislature made it a criminal offense for any person, at any time or in any manner, negligently or with design, to put, or cause to be put, into the Oconto river in Oconto county, any refuse lumber, slabs, sawdust, or other waste materials to an extent that should materially hinder or obstruct navigation. Ch. 506, P. & L. Laws of 1867. Flat Rock dam is the principal structure of the defendants, and is situated fourteen miles above the plaintiff's dam. It was first constructed under ch. 303, P. & L. Laws of 1869, which authorized the defendant *The Northwestern Improvement Company* and its successors to improve the portions of the Oconto river and its branches

and tributaries described, by blasting rocks, dredging, and ditching in the several channels within such limits, and by constructing dams, wing dams, booms, side booms, chutes, or slides, and by all other proper means for making the same navigable for the driving of sawlogs; and for that purpose the company was thereby expressly authorized to entirely close any slough, bayou, or channel so as to prevent the diversion of water from the channel so improved, and to charge and collect tolls for all logs or timber run through such improvements, at the rates therein specified. By the act of Congress of July 12, 1876, consent was expressly given to the defendant *The Northwestern Improvement Company* "to improve the Oconto river and its branches and tributaries, so as to run logs down said river and its branches and tributaries, across the Menomonee Indian reservation, in accordance with the laws of" Wisconsin, subject to the conditions therein named.     19 Stats. at Large, 89.

On December 31, 1890, the defendant *The Oconto River Improvement Company* was incorporated under ch. 86, R. S., and the amendments thereto, for the purpose, as expressed in its articles of incorporation and charter, of improving the Oconto river and its branches, and driving, sorting, and delivering logs and timber therein, as provided in said chapter.     The formation of such corporations is therein expressly authorized for the purpose of the "improvement of rivers and streams, and for driving, sorting and delivering logs or timber."     S. & B. Ann. Stats. sec. 1771.     It is further expressly provided in that chapter that any corporation formed thereunder " in whole or in part for the improvement of any stream and driving logs therein and for holding or handling logs therein, which shall have taken prior possession of such stream for that purpose, shall have power to improve such stream and its tributaries, by cleaning and straightening the channels thereof, closing sloughs,

erecting sluice-ways, booms of all kinds, side rolling and flooding dams, or otherwise, if necessary; but shall in no case, in any manner, materially obstruct or impede navigation upon such streams, or erect any dam or other obstruction below the head of steamboat navigation, or obstruct any navigable slough, except with the written consent of the owners of the entire shores on both sides thereof." S. & B. Ann. Stats. sec. 1777. The same section not only authorizes such corporation to take charge of logs at the request of the owner, but, under certain conditions mentioned, to take possession of any and all logs put into such stream, and to drive the same to their respective destinations; and also expressly provides that "no injunctional order shall be granted to prevent the use or enjoyment of any such improvement, or abate any such dam necessary thereto, unless such corporation shall fail for sixty days after judgment to pay any damages recovered for any injury done by or in consequence of its works."

On January 27, 1891, the defendant *Northwestern Improvement Company* conveyed to the defendant *Oconto River Improvement Company* the Flat Rock dam and all its improvements on the river and its branches; and that company has since operated the same substantially as before, to drive annually substantially the same quantity of logs.

There is no claim that the defendants have at any time improperly operated their flooding dam, nor that they have exceeded the powers thus given to them by the several statutes mentioned. The contention is that the plaintiff is also acting under statutory authority, prior in time, and that the rights of the respective parties are correlative; in other words, the contention is that the defendants cannot so operate their flooding dam as to impair the efficiency of the plaintiff's water power. As indicated in the foregoing statement, the flooding dam is fourteen miles above the

plaintiff's water power. Of course, the plaintiff has no title or ownership to any of the particles of water at the flooding dam, nor anywhere in the river. *Lawson v. Mowry*, 52 Wis. 234. It is the use of water while passing that gives it value. *Ibid.* It is only the interference with such use by the plaintiff that is here complained of. One of the purposes of the flooding dam is to detain the water, from time to time, when the stream is low, until a sufficient quantity has accumulated to successfully float the logs to their destination, and then to let off the same in larger volume. When so detained, it frequently diminishes the water power at the plaintiff's mills so as to prevent some of them from running at all, or at their full capacity. It is the injury resulting from such detention of water that is here made the principal ground of complaint. Counsel for the plaintiff here invoke the equitable powers of the court to prevent such intermittent increase and decrease in the flow of the water at its mill, and to regulate the rights of the respective parties in regard to such flow. Undoubtedly, in a proper case, equity will interpose to regulate the common use of water, to determine the extent of conflicting claims thereto and the proper mode of exercising and enjoying such rights, as tending to prevent litigation and affording a more complete and perfect remedy than could be obtained at law. *Lawson v. Menasha W. W. Co.* 59 Wis. 398. In support of such contentions, counsel cite numerous adjudications from other states, and also seem to rely upon two cases decided by this court. *Miller v. Sherry*, 65 Wis. 129; *A. C. Conn Co. v. Little Suamico L. M. Co.* 74 Wis. 652. In neither of these cases was the question of statutory authority involved. The controlling fact here present is that the flooding dam and other improvements of the defendants were constructed *under statutory authority*, at great expense, for the express purpose of aiding in the transportation of sawlogs and timber, on the Oconto and

its several branches and their tributaries. If such statutes are valid and the defendants do not transcend the authority thereby given, and the stream is confined within its banks, then it would seem the defendants are at liberty to operate the flooding dam for the purposes mentioned, regardless of whether it increases or diminishes the volume of the stream at the plaintiff's mills fourteen miles below.

The law, as settled by a long line of decisions in this state, is that streams of sufficient capacity to float logs to market are navigable. *Weatherby v. Meiklejohn,* 56 Wis. 76, and cases there cited; *A. C. Conn Co. v. Little Suamico L. M. Co.* 74 Wis. 655. These cases treat such streams as public highways or waterways. In the last case cited, COLE, C. J., said: "The real test to determine whether the stream is a public highway is not the fact that it has been meandered and returned as navigable, but whether it is navigable in fact,— capable of being used, and actually used, for floating lumber and logs and other products of the country to mill and market. If it is, it is then a public highway. So that, where a stream is in fact usefully navigable in this manner, all the rights of the public attach, and no obstruction can be placed therein without legislative permission." We are told by counsel that it is an unfortunate misnomer to call such streams navigable, because they do not bear ships upon their bosoms. Of course, they are not navigable to the extent, nor in the sense, that Lake Michigan or Green Bay or the Mississippi river are navigable, but that does not prevent their being navigable. "In the United States, the legal meaning of 'navigable' has been much extended, and it includes, generally, all waters practically available for floating commerce by any method, as by rafts or boats." Cent. Dict. Thus, in *The Montello,* 20 Wall. 430, it was held that the navigability of a stream does not depend upon the mode by which commerce is conducted upon it, nor upon the difficulties attend-

ing the navigation, but upon the fact whether the stream, in its natural state, is such as to afford a channel for useful commerce. That doctrine was in that case applied to the Fox river, which originally was not fitted for useful commerce, but was only navigated by Durham boats. The act of Congress mentioned, provided that the Menomonee "Indians and all other persons shall be permitted to use said river for the purpose of running logs, as contemplated in this act, and the charges for said privileges shall be regulated by the legislature of the state of Wisconsin." The acts of the legislature referred to treat the Oconto as a navigable river. The findings of the trial court conclusively determine, so far as this case is concerned, that the river and its branches are, as a matter of fact, public navigable waterways for the transportation of logs and timber, as indicated.

Being such public navigable waterways, the legislature must, under numerous adjudications of this court, be regarded as having, in aid of such navigation, plenary power to authorize such flooding dams and other structures. *Wisconsin R. Imp. Co. v. Manson*, 43 Wis. 255; *Stevens Point Boom Co. v. Reilly*, 44 Wis. 295; *S. C.* 46 Wis. 237; *Cohn v. Wausau Boom Co.* 47 Wis. 314; *Borchardt v. Wausau Boom Co.* 54 Wis. 107; *Black River F. D. Asso. v. Ketchum*, 54 Wis. 313; *Edwards v. Wausau Boom Co.* 67 Wis. 463. In *Black River Imp. Co. v. La Crosse B. & T. Co.* 54 Wis. 659, it was in effect held that in aid of such navigation the legislature had legally authorized the closing up of Black Snake river, a branch of the Black river, even though it incidentally injured private persons. To the same effect, *South Carolina v. Georgia*, 93 U. S. 4. In *Rundle v. D. & R. Canal Co.* 14 How. 80, the efficiency of the water power was very much impaired, if not destroyed, by the canal which, under statutory authority, tapped the river above the dam, but it was held that the owner of the

dam was without remedy. Thus, in *Wisconsin R. Imp. Co. v. Manson*, 43 Wis. 265, it is said: "The legislature is, primarily at least, the judge of the necessity of the improvement; and when it delegates the power to a corporation, and the state does not question that the improvement made by the corporation is in conformity with the delegated power, it seems to us that neither the necessity nor usefulness of the improvement, nor the manner in which it is made, can be called in question by private parties." To the same effect, *J. S. Keator Lumber Co. v. St. Croix Boom Corp.* 72 Wis. 80–87; *Underwood Lumber Co. v. Pelican Boom Co.* 76 Wis. 85. The same doctrine has been repeatedly sanctioned by the supreme court of the United States. Thus, in *Huse v. Glover*, 119 U. S. 543, it was held: "If, in the opinion of a state, its commerce will be more benefited by improving a navigable stream within its borders than by leaving the same in its natural state, it may authorize the improvements, although increased inconvenience and expense may thereby attend the business of individuals." So, in *Sands v. M. R. Imp. Co.* 123 U. S. 288, it was held, in effect, that the commerce which is confined wholly within the limits of a particular state is subject to the absolute control of such state, and that, to encourage the growth of such commerce and render it safe, such state may provide for the removal of obstructions from its rivers and harbors, and deepen their channels and improve them in other ways, and exact a reasonable toll from those who use the same, as compensation therefor; and that such exaction does not deprive the person paying the same of his property without due process. In *Willamette I. B. Co. v. Hatch*, 125 U. S. 1, it was held that, until Congress acts respecting navigable streams entirely within a particular state, such state has plenary power over the same. That such is the law is regarded as no longer an open question in the late case of *Monongahela Nav. Co. v. U. S.* 148 U. S. 329 330.

The more serious question has at times been raised as to whether the legislature had power to authorize obstruction to such navigation in such streams, in view of the provisions of our state constitution, which declares, in effect, that "the navigable waters leading into the Mississippi and St. Lawrence, and the carrying places between the same, shall be common highways and forever free, as well to the inhabitants of the state, as to the citizens of the United States, without any tax, impost or duty therefor." Sec. 1, art. IX. In construing similar clauses in the enabling acts of several of the states, the supreme court of the United States, in some of the cases cited and others, has uniformly held that it does not refer to physical obstructions, but merely to political regulations which would hamper the freedom of commerce. *Willamette I. B. Co. v. Hatch*, 125 U. S. 1, and cases there cited; *J. S. Keator Lumber Co. v. St. Croix Boom Corp.* 72 Wis. 62, and cases there cited. It is, however, unnecessary to determine that question here.

*By the Court.*— The judgment of the circuit court is affirmed.