ROBERTS v. BLAIR.

Defendant, while playing at "poker," bought "chips" to the amount of $1,500, and paid therefor, after the keeper of the house had refused to sell him on credit, by assignment of a certificate of deposit, and lost the entire sum. At the close of the game, on defendant's request, and his stating that he had a note of $400 to take up in bank, the keeper of the house loaned him that sum and took his

note therefor. *Held*, that the loan was not a gambling debt, and that a note, including the ·loan, was not infected with a gaming consideration.

### *Error to District Court of San Juan County.*

ACTION by Robert Roberts, assignee, upon a promissory note, against Thomas Blair, the maker. Judgment for defendant. Plaintiff brings error.

Messrs. HUDSON and SLAYMAKER, for plaintiff in error.

Mr. C. H. TOLL, for defendant in error.

DE FRANCE, C. The defendant, Thomas Blair, gáve his promissory note to one Edward Gorman for the sum of $450, bearing date the 14th day of October, 1882, and payable to said Gorman on the 8th day of March, 1883, with interest from date at one-half per cent. per month until paid. The plaintiff, Roberts, brought this action, founded upon said note, alleging in his complaint that the same was assigned to him on the 21st day of February, 1883, before the maturity thereof. The defense is that $400 of the consideration of said note is for a gambling debt contracted with Gorman, the payee of said note, by playing with him at a game of cards called "poker," for stakes upon credit, and not for ready money. The plaintiff, in his testimony, says that the note was assigned to him by Gorman on the 21st day of February, 1883, that he paid Gorman $350 therefor, and that at the time of its assignment to him he had no notice or knowledge of the existence of any such defense thereto. These facts are not denied by the other testimony in the case. It appears from the testimony that Gorman, the payee of the note, was the proprietor of a gambling-house; and that himself, the defendant Blair, and others, including one Thornton, engaged in a game of poker thereat. The defendant lost what ready money he had with him, being from $80 to $100, and then "asked for more chips,"

as he expresses it, with which to continue the play. Gorman refused to let him have chips upon credit or without the money therefor, and thereupon the defendant indorsed and delivered to Gorman a certificate of deposit calling for $1,500; and thereafter, and before the game closed, obtained chips thereon from Gorman to the full amount thereof, namely, $1,500 worth. Before the game closed Gorman went to the bank and had this certificate of deposit cashed. The defendant says he lost $1,600 in said game. Gorman says the defendant had about $80 worth of chips when the game closed. After the game had closed the defendant said to Gorman and Thornton: " I have a note for $400 to take up in the bank, and I will give you a note on the bank and you give me $400." Thornton refused this request, but Gorman let defendant have the $400 asked for, and the defendant gave Gorman his note therefor, which was afterwards, on account of another transaction, involving the sum of $50, taken up by the defendant, and the note in suit was given in place thereof, including this $50. The trial was to the court, and the finding and judgment were in favor of the defendant.

The only witnesses who testified to the facts of the gaming transaction upon which the defense is based are Gorman, the payee of said note, and the defendant, Blair, and there is no conflict in their testimony in reference to the material facts. They do differ in their conclusions, however; Blair asserting that the consideration of the note, to the extent of $400, is a gambling debt, while Gorman insists that the $400 transaction was simply a loan to the defendant. The opinions of witnesses are not allowable to determine a question of such a nature. The evidence shows this game to have been played for ready money, or its equivalent, and not for stakes upon credit, as alleged in the answer. The chips used in playing the game represented money. Gorman, the keeper of the house, delivered the chips to the players, and they

deposited with him the money, to abide the result of the game. The delivery of the certificate of deposit to Gorman by the defendant was practically the same as depositing $1,500 in money, against which to draw chips at pleasure. The defendant thus paid for what chips he obtained as he received them. When the game closed Blair was not indebted to Gorman either for chips, or upon any other account connected with or arising out of said gaming transaction. There was no gambling debt to give his note for, so far as the evidence shows. In so far as there was any contract between Gorman and the defendant in relation to said gaming transaction, it was discharged. *Bell v. Parker*, 3 Dana, 51. Whether the money which Gorman let the defendant have at the close of the game, and for which the $400 note was given, was a part of the same money which Gorman received for said certificate of deposit, is not shown. But this could make no difference in any event. After receiving pay for what chips he may have had at the close of the game, Blair had no longer any interest in such money. Nor can it be said that this loan was affected with a gaming consideration, because made at a time and place where such games of chance as are prohibited by law were being played or conducted. Some further showing would be required to make it such. There is no evidence of any agreement between Gorman and Blair to treat this loan as a gambling debt; nor is it at all probable that Gorman assented to such an arrangement. He had just refused to contract such a debt with the defendant, by denying him chips upon credit; and it must be presumed that Gorman, as the keeper of such a house, well knew that the payment of a debt of that kind could not be enforced.

Observing the proper distinction between evidence and testimony, and leaving out of Blair's testimony his own conclusions, which are not evidence, we see nothing in

the evidence to support the finding of the court. The judgment should be reversed and the cause remanded.

We concur: RISING, C.; STALLCUP, C.

PER CURIAM. For the reasons assigned in the foregoing opinion the judgment is reversed and the cause remanded.

*Reversed.*