[No. 7919.  *En Banc.*  July 10, 1909.]

GRAYS HARBOR BOOM COMPANY, *Appellant*, v.

J. P. O. LOWNSDALE *et al.*, *Respondents.*[1]

APPEAL—RECORD—STATEMENT OF FACTS—CERTIFICATE BY SUCCESSOR ON DEATH OF TRIAL JUDGE. Bal. Code, § 5061, authorizes the settlement of a statement of facts, after the death of the judge who tried the case, by his successor in office; and if the judgment was rendered by a visiting judge in another county than that of his residence, his successor in office may certify the statement of facts while presiding as a visiting judge in such county.

EMINENT DOMAIN—DAMAGES—WATER COURSES—RIPARIAN RIGHTS —VALUE OF SHORE AS BOOM SITE. In condemnation proceedings by a boom company to condemn riparian rights of owners on the bank of a stream in which the tide ebbs and flows, the owners are not entitled to have the damages assessed with reference to the value of the property as a boom site; since the right to maintain a boom is not appurtenant to the uplands, the tide lands belong to the state, and the boom site may be granted by the state without reference to riparian ownership (RUDKIN, C. J., DUNBAR, and GOSE, JJ., dissenting).

SAME—TRIAL—DAMAGES. A verdict on the question of damages in a condemnation proceeding is not conclusive as to the amount of damages, if there was error in injecting into the case an improper element of damages.

APPEAL—REVIEW—EVIDENCE—ERROR NOT CURED BY INSTRUCTIONS. In condemnation proceedings, error in receiving evidence of an improper element of damages and refusing, in the presence of the jury, to strike out such incompetent evidence, which indirectly affected the verdict, is not cured by instructions to the jury that they should not consider that element in estimating the damages.

NAVIGABLE WATERS—LANDS UNDER WATER—RIGHTS OF STATE. Under Const., art. 17, § 1, the state owns the beds and shores of all navigable waters up to the line of ordinary high tide.

RIPARIAN RIGHTS—TIDE LANDS—EMINENT DOMAIN—DAMAGES. In condemnation proceedings of lands and shore rights for a boom site, a riparian owner is not entitled to damages for the probable value of his land for a mill site or for commercial purposes depending in any degree on the use of the tide lands embraced in the boom site.

[1] Reported in 102 Pac. 1041; 104 Pac. 267.

EMINENT DOMAIN—DAMAGES—PROBABLE VALUE OF SHORE LANDS. To recover, in condemnation of shore lands, for the contemplated use of the lands as a mill site, the use must be shown to be available, and that means a possible use not dependent on the abandonment of the use of adjoining lands of another, or upon remote, uncertain or speculative contingencies.

EMINENT DOMAIN—DAMAGES—EVIDENCE OF VALUE—MEASURE. In determining the damages in condemnation proceedings, evidence of the price paid for the land more than fifteen years ago is inadmissible; the present value and the diminution by reason of the proposed appropriation being the true basis.

SAME—SHORE LANDS—DAMAGE BY LAWFUL MAINTENANCE OF BOOM. In condemnation for a boom site, the owners are entitled to compensation for the land taken and added inconveniences in getting to the navigable channel, and for damages by reason of erosions necessarily caused by the proper and lawful maintenance of the boom, and the changed use of the stream.

EMINENT DOMAIN — PREPAYMENT OF DAMAGES — APPEAL — COSTS AGAINST LANDOWNER. Under the constitutional provision prohibiting the taking of private property without just compensation being first made or paid into court, costs of an appeal, successfully prosecuted by the petitioner from an award of damages, cannot be taxed against the landowner, on remanding the case for a retrial to determine the proper damages; since the petitioner must pay all costs of the proceedings to ascertain the damages.

COURTS—RULE OF DECISION—FEDERAL QUESTION. The right of the owner of uplands, condemned for a boom site, to claim damages by reason of the value of his property as a boom site, does not raise any Federal question, where the state and not the abutter owned the tide lands condemned for the site.

Appeal from a judgment of the superior court for Chehalis county, Linn, J., entered October 26, 1908, upon the verdict of a jury rendered in favor of the defendant, awarding damages in condemnation proceedings. Reversed.

*J. B. Bridges* and *Ben Sheeks*, for appellant.

*J. C. Cross* and *Thos. Vance* (*A. Emerson Cross*, of counsel), for respondents.

CHADWICK, J.—This case was tried in the superior court for Chehalis county by the late Judge Linn. Judge Linn was at the time the judge elected and presiding in Thurston

county.   He overruled the motion for a new trial, and an
appeal was taken, but before the statement of facts was ready
for settlement, he died.   Attempting to comply with the
statute, the Honorable. Mason Irwin, presiding judge for
Chehalis county, called Honorable John R. Mitchell, who
had been appointed and had qualified as Judge Linn's suc-
cessor, to settle the statement of facts.   Bal. Code, § 5061
(P. C. §678), reads as follows:

"If the judge before whom the cause was pending or tried
shall from any cause have ceased to be such judge he shall,
notwithstanding, settle and certify, as the late judge, any
bill of exceptions or statement of facts that it would be
proper for him to settle and certify if he were still such
judge, and such acts on his part shall have the same effect
as if he were still in office; and he may be compelled by man-
date so to do, as if still in office.   If such judge shall die or
remove from the state while in office or afterwards, within
the time within which a bill of exceptions or statement of
facts, in a cause that was pending or tried before him, might
be settled and certified under the provisions of this chapter,
and before having certified such bill or statement, such bill
or statement may be settled by stipulation of the parties
with the same effect as if duly settled and certified by such
judge while still in office.   But if the parties cannot agree,
and if such judge, when removed from the state, does not
attend within the state and settle and certify a bill of excep-
tions or statement of facts in case one has been duly proposed,
his successor in office shall settle and certify such bill or state-
ment in the manner in this chapter provided, and in so do-
ing he shall be guided, so far as practicable, by the minutes
taken by his predecessor in office, or by the stenographer,
if one was in attendance on the court or judge, and may, in
order to determine any disputed matter not sufficiently ap-
pearing upon such minutes, examine under oath the attor-
neys in the cause who were present at the trial or hearing,
or any of them."

We are asked to hold, (1) that the statute makes no pro-
vision for the certification of the facts occurring upon the
trial, by a successor of the trial judge who may have died,
and (2) that if a successor can so act, it was the duty of the

judge presiding in Chehalis county to perform that function. The only reference to the probable death of a trial judge in the statute is found in the words "if such judge shall die or remove from the state." The succeeding parts of the statute are drawn on the theory of removal from the state, and under a technical construction, it might be held that there was an omission affecting appellant's right of appeal. We think, however, that the clear intent of the statute is to cover any case, whether it be occasioned by death, disability, or removal from the state. To hold otherwise would deny a substantial right, if not a constitutional guaranty. The second point is also without merit. It is insisted that judges have successors, but courts are legal creations. Counsel says:

"When the case was tried it was tried by the judge of the superior court of Washington for Chehalis county, and while the personnel or judge of the court before whom the case was tried was a visiting judge, the successor in office of that visiting judge is not the one contemplated by the statute to settle and certify the statement of facts."

This argument furnishes its own answer. If it be sound, Judge Mitchell while settling the statement of facts was as much the judge of the superior court of Chehalis county where he was presiding as was Judge Linn who tried the case, or as is Judge Irwin, and was therefore a proper judge to certify the statement of facts. The motion to dismiss the appeal is denied.

This is a proceeding brought by the Grays Harbor Boom Company to condemn certain lands lying adjacent to its boom grounds, a tidal slough known as "Jessie" slough, and a way along it for the convenience of its employees, and the shore rights of respondents, all of which it alleges are necessary to the prosecution of its enterprise as a public boom company. The petitioner is a boom company organized under the laws of the state of Washington, and for a number of years last past has operated a boom on the Humptulips river. There have been a number of cases decided in

this court involving the rights of the respective parties. In May, 1906, the company was enjoined by the superior court for Chehalis county from further use of its boom grounds to the injury of the banks and shores of respondents' lands. This case was affirmed on appeal. *Lownsdale v. Grays Harbor Boom Co.*, 44 Wash. 699, 87 Pac. 943. The decision was later modified so as to permit appellant to institute condemnation proceedings. This it did. In *State ex rel. Burrows v. Superior Court*, 48 Wash. 277, 93 Pac. 423, the question of necessity and the extent of appellant's right under its power of eminent domain was settled by this court, and the case sent back for trial on the question of damages. From an award in favor of respondents, the petitioner has appealed.

Numerous errors are assigned. All those which we regard as material go to the theory of damages entertained by respondents, and upon which the court permitted the evidence to go to the jury. The evidence of the respective parties varied in a wide degree. Respondents' witnesses fix the amount of the damages in sums running from $25,000 to $60,000, while the petitioner's witnesses fixed the value of respondents' lands in sums not exceeding $2,000. It is insisted by respondents that we should not inquire into the question of damages, or grant a new trial because the verdict was excessive. To sustain this contention, they cite the opinion of Judge Hanford in the case of *United States v. Freeman*, 113 Fed. 370, wherein he said, upon the authority of *Seattle & Montana R. Co. v. O'Meara*, 4 Wash. 17, 29 Pac. 835; *Tacoma v. State*, 4 Wash. 64, 29 Pac. 847; *Long v. Billings*, 7 Wash. 267, 34 Pac. 936; and *Western American Co. v. St. Ann Co.*, 22 Wash. 158, 60 Pac. 158, that:

"I adhere to the ruling made by this court in the case of *U. S. v. Tennant* (D. C.) 93 Fed. 613, to the effect that in condemnation cases in this state the law does not authorize the court of original jurisdiction to set aside the verdict of a jury on the ground that the appraisement was erroneous or unfair. Upon a re-examination of the question I am con-

firmed in the opinion that the statutes of this state as expounded by its supreme court prescribe a special and peculiar mode of procedure distinct from the practice in civil actions. Therefore the provisions of the civil practice act authorizing courts in which actions are tried to set aside verdicts for error in assessment of damages are not applicable, and do not authorize the same courts to grant new trials in condemnation cases."

Without discussing the justice or propriety of that decision or the cases upon which it rests, the record indicates to us that it should not be applied here. Admitting that the rule is well founded, the cases do not hold that a verdict concludes the law of the case. Although if a case be tried without error a court should be reluctant to grant a new trial because of excessive damages, when an improper element of damages is injected into the case, it becomes the duty of the court to set aside the verdict. Petitioner was entitled to have the question of damages submitted on a proper measure. This the court did not do. Without quoting from the evidence, it is enough to say that the witnesses on behalf of respondents base their estimate of damages, in part at least, upon the value of the property as a boom site, or in consideration of its adaptability for a mill site or for commercial purposes. A motion was made to strike this testimony, and it was overruled by the court. The court did, however, instruct the jury as follows:

"In estimating the value or damage you must not take into consideration the special value to the company, by reason of its necessity, but the market value. Nor should you take into consideration, the value of defendant's property as a boom site."

"The waters of the Humptulips river and Jessie Slough in front of defendant's lands, are navigable waters, within the meaning of the law, and defendant, by reason of the ownership of the lands abutting on said river and slough, would have no proprietary rights in any boom site furnished by the channels of said waters, and would not be entitled to have the values of such boom site considered in estimating the value

of his lands, as his proprietary interest does not come below the line of ordinary high tide."

These instructions correctly stated the law. The right of maintaining booms in a navigable tidal stream of the state is not a right incident or appurtenant to the uplands. Tide lands belonging primarily to the state, and subject to the rights of navigation to be determined by the secretary of war, may be granted or sold by the state without reference to any assertion of riparian ownership in the land conveyed. This boom site having been granted by the state, the loss of its use cannot be considered as an element of damages in a suit to condemn the rights and privileges appurtenant to the shore line. Hence, the rule applicable to the condemnation of land along nontidal streams is not pertinent, and the testimony should have been stricken by the court. The record indicates that the amount returned could not have been found by the jury without considering the objectionable testimony. A trial upon one theory and instructions of the court founded upon an entirely different theory present a most unusual situation, and under the circumstances of this particular case we are unable to say that the error of the court was cured by his instruction. The court had refused, in the presence of the jury, to strike out the incompetent testimony, and the jury might have been, and probably was, misled as to its effect. It was the duty of the court to try the case upon, as well as instruct, the law of the case. It was his duty to take away from the jury all of the testimony predicated upon the value of the property as a boom site, by specially calling their attention to his errors occurring on the trial; or when a verdict was rendered showing that the jury must have considered a wrong measure of damages, he should have granted a new trial. We have not overlooked the fact that some of the witnesses spoke of the property as valuable for commercial purposes or for a mill site. But this will not cure the error of the court. Respondents have all the rights in their lands that they ever had, and whatever they may be, they are

subordinate to and subject to the rights of the grantee of the state to maintain boom grounds in front of them. If, therefore, the probable value of the land for a mill site or for commercial purposes depends in any degree on the use of the tide lands now embraced in the boom site, it could not be considered a proper element of damages.

The trial court seems to have proceeded upon the theory that the general rights incident to riparian ownership along navigable streams apply in this case. Respondents cite a number of cases to sustain this theory, but all of them seem to turn on the theory that the owner of the land had title, not only to the upland but the land under the water, a condition which is not here present, and cannot be from the very nature of the case. The state has asserted title to the lands over which the tide ebbs and flows, and respondents' title carries them no further than the line of ordinary high tide. It would be useless, then, to review the authorities relied upon by respondents. The rule pertaining to the rights incident to ownership of lands along tidal streams over which the state had or might assert its ownership, was before the court in the early case of *Eisenbach v. Hatfield*, 2 Wash. 236, 26 Pac. 539, 12 L. R. A. 632. A careful review of the authorities impelled this conclusion:

"The result of our investigation of the authorities leads us to the conclusion that riparian proprietors on the shore of the navigable waters of the state have no special or peculiar rights therein as an incident to their estate. To hold otherwise would be to deny the power of the state to deal with its own property as it may deem best for the public good. If the state cannot exercise its constitutional right to erect wharves and other structures upon its public waters in aid of navigation without the consent of adjoining owners, it is obviously deficient in the powers of self-development, which every government is supposed to possess—a proposition to which we cannot assent. See *Galveston v. Menard*, 23 Tex. 349. Nor do we think this view in any way conflicts with the constitution of the state, but, on the contrary, we believe it is in strict harmony with it, when all its parts are construed

together.   We cannot think that the building by the state or its grantees of wharves upon shores of navigable waters would constitute either a taking or damaging of private property for public use, in contemplation of the constitution."

We are asked to distinguish this case in favor of respondents, upon the theory that the Humptulips river is a navigable stream, and not a bay, inlet, or arm of the sea.   The right of the state is not to be measured by the name or character of the waters, but by the physical condition.   Does the tide ebb and flow in the stream under discussion?   If so, the constitution, § 1, art. 17, expressly asserts title "to the beds and shores of all navigable waters in the state, up to and including the line of ordinary high tide, in the waters where the tide ebbs and flows, and up to and including the line of ordinary high water within the banks of all navigable rivers and lakes." While the doctrine of the *Eisenbach* case has been at times overlooked by this court, thus permitting an element of confusion to arise in our decisions, it is so clearly sustained by reason and authority, and so securely rests upon the constitutional provision just cited, that we consider it controlling in all cases of this character.   In the recent cases of *Muir v. Johnson*, 49 Wash. 66, 94 Pac. 899, and *Brace & Hergert Mill Co. v. State*, 49 Wash. 326, 95 Pac. 278, it is cited as controlling.   In the latter case the decisions of this court, as well as those of the supreme court of the United States, are collected, and need no further citation or review.

If this were not true as a matter of law, the testimony upon this feature of the case is too vague and uncertain to warrant a verdict.   It is not shown that the use of respondents' lands for a sawmill is contemplated or even probable within any reasonable time, or that it could be so used independently of the lands occupied by petitioner.   The contemplated use, in proper cases, must not only be available but valuable.   In this connection an available use means a possible use, not a use contingent upon the abandonment of the use of adjoining property engaged by another in the public service of the

state, or upon conditions remote, uncertain, and speculative. *Chicago, Milwaukee etc. R. Co. v. Alexander*, 47 Wash. 131, 91 Pac. 626.

So far, then, as the element of commercial use becomes a subject for our review, the lands of respondents are not taken or damaged in the general sense. Damages, if any, are those resulting to shore rights, by erosion or flooding, for land actually taken, and the added inconveniences, if any, to the landowner in getting to and from the navigable channel reserved by the secretary of war. They grow out of, as they must in all cases, the nature of the use to which the stream will be put by appellant. Upon this theory, the admission of evidence as to the price paid by respondents in 1891, and accumulated interest on the purchase price, was immaterial and prejudicial error on the part of the court. The purchase was not so recent that any presumption of value at the present time could flow therefrom. 2 Lewis, Eminent Domain (2d ed.), 444; *Denver etc. R. Co. v. Schmitt*, 11 Colo. 56, 16 Pac. 842; *Dietrichs v. Lincoln & N. W. R. Co.*, 12 Neb. 225, 10 N. W. 718; *Omaha South R. Co. v. Todd*, 39 Neb. 818, 58 N. W. 289; *Lanquist v. Chicago*, 200 Ill. 69, 65 N. E. 681. The present value of the property at the time of the trial, and the consequent diminution in value by reason of the proposed appropriation, is the true basis for estimating damages. *Grays Harbor & Puget Sound R. Co. v. Kauppinen*, 53 Wash. 238, 101 Pac. 835.

We are asked to hold that no damages for which the law will render compensation can result to respondents by reason of such erosions as are necessarily caused by the proper maintenance and operation of appellant's boom; this on the theory that the boom is a lawful structure, and that no consequential damages can result from its use. A number of cases are cited, none of which are persuasive. They discuss questions involving the erection of piers, bridges, or obstructions to navigation under Federal authority. No land and no right incident to ownership was taken. In this case respondents

are the owners of the shore line and the banks of the stream
and, while their interests must give way to the public interest,
they are entitled to damages accruing from the changed use
of the stream, even though the proposed use be a lawful one.
*Burrows v. Grays Harbor Boom Co.*, 44 Wash. 630, 87 Pac.
937 ; *Monroe Mill Co. v. Menzel*, 35 Wash. 487, 77 Pac. 813,
102 Am. St. 905, 70 L. R. A. 272.

The judgment of the lower court is reversed, and a new
trial ordered.

FULLERTON, MORRIS, PARKER, MOUNT, and CROW, JJ.,
concur.

RUDKIN, C. J. (dissenting)—I am of the opinion that the
jury had a right to take into consideration the value of the
property for boom purposes under the decision of the su-
preme court of the United States in *Boom Co. v. Patterson*,
98 U. S. 403, 25 L. Ed. 206 ; and on the authority of that
case, and for the reasons there stated, I dissent.

GOSE and DUNBAR, JJ., concur with RUDKIN, C. J.

## ON MOTION TO RETAX COSTS.
[*En Banc.*  Decided October 9, 1909.]

PER CURIAM.—A proceeding was brought by the Grays
Harbor Boom Company to condemn certain lands and shore
rights of respondents lying adjacent to its boom grounds.
The boom company is organized under the laws of the
state of Washington.  Upon the trial of the cause, a cer-
tain amount of damages was awarded to the landowners,
the petitioner here, and the boom company, considering it-
self aggrieved by such award, appealed to this court.  The
appeal was sustained, the judgment was reversed, and a new
trial ordered.  Following the reversal, the boom company filed
a bill of costs in this court, amounting to $172.85, which the
clerk of this court taxed against the petitioner, the respond-
ents in the original case.  The respondents now petition this
court to strike said cost bill, and for an order authorizing and

directing the taxation of costs in favor of respondents and against appellant.

This motion will have to be sustained. This court held, in *Peterson v. Smith*, 6 Wash. 163, 32 Pac. 1050, that in a case of condemnation of land under the provisions of the constitution, providing that no private property shall be taken or damaged for public or private use without just compensation having been first made or paid into the court for the owner, and until full compensation be first made in money or ascertained and paid into the court for the owner, the owner could remain quiet and be assured that, before his property was condemned, the county in that case must ascertain his damage and either pay him or pay it into the court for his benefit, and that the amount of his damage must be ascertained in a court, in a proceeding instituted for that purpose, and in which the defendant may appear and make a showing if he so desire. Under this provision of the constitution, and under the law as announced in the case just above cited, and all the subsequent cases on this subject, the landowner cannot be put to any costs whatever for the ascertainment of the damages. All costs must be paid by the condemning party until a valid judgment is obtained.

It is true, we held in *Kitsap County v. Melker*, 52 Wash. 49, 100 Pac. 150, that, where the award was appealed from by the landowner and the judgment in this court went against him, the condemning party, who was put to the expense of defending the appeal which proves futile, the landowner should pay the costs of such appeal; but that case has no bearing on the case in question, for here the landowner was contented with the award which he secured from the court trying the cause; and notwithstanding the fact that this court on appeal found that the award was too large, he is entitled to await the final determination of the question without taking any action whatever, and to be protected in his interests without costs to him until the question is finally determined by a valid judgment. The constitution says that

the land shall not be appropriated until full compensation therefor be first made in money, or ascertained and paid into court for the owner. Now, the appeal in this case was for the purpose of ascertaining the value of the land. That value has not yet been judicially determined, for that will be the subject of consideration at the next trial of the cause.

A case squarely in point on this subject is *Matter of New York etc. R. Co.*, 94 N. Y. 287. There the court, in speaking to this point, said:

"The only point remaining to be considered is the appeal from the judgment for costs rendered by the General Term against the landowners, on reversing the order of confirmation and appointing new commissioners, amounting to $120.70. We are of the opinion that the General Term had no power to award these costs. If the appeal to the General Term had been taken by the landowners, and they had been defeated, it may be that the court could, in its discretion, have compelled them to pay the costs to which they had subjected the company by such an appeal. But the appeal was taken by the company because it was dissatisfied with the amount awarded, and was a continuation of the proceeding instituted by it to ascertain the compensation payable to the landowners, to acquire their land against their will. In such a case to compel the landowners to pay any part of the expenses incurred by the company for the purpose of ascertaining the compensation, which proceedings were an indispensable condition of its right to take the land, would conflict with the constitutional right of the landowners to just compensation."

To the same effect is *Stolze v. Milwaukee etc. R. Co.*, 113 Wis. 44, 88 N. W. 919, 90 Am. St. 833, where many cases are cited sustaining the decision.

The motion will be sustained, and the bill of costs stricken, with costs to the petitioner.

### On Petition for Rehearing.
[*En Banc.* October 15, 1909.]

PER CURIAM.—A petition for a rehearing has been filed in this case, in which it is urgently and earnestly contended that

respondents' right to claim the value of their property, considered as a boom site or as valuable for other commercial purposes, is a Federal question, and should be so treated by this court. Respondents are of opinion, that the decision of this court results in a taking of their property without due process of law; that their property is taken without just compensation, and that they are denied the equal protection of the laws, all of which is in violation of the rights guaranteed to the citizen under the constitution of the state of Washington, the Federal constitution, and the fourteenth amendment thereto. From this premise, the question of what is the proper measure of damages is re-argued.

If respondents were the owners of the tide land occupied by appellant, the authorities cited would unquestionably sustain their position. In the case of *Boom Co. v. Patterson*, 98 U. S. 403, 408, 25 L. Ed. 206, the principal case relied on by respondents, it was said that, upon condemnation,

"The compensation to the owner is to be estimated by reference to the uses for which the property is suitable, having regard to the existing business or wants of the community, or such as may be reasonably expected in the immediate future."

This rule has been accepted by almost every court in the Union. An altogether different condition is here presented. Appellant is not taking the property of respondents, as was done in the *Patterson* case. There the owner of the island involved had a riparian right, and with it the right to exercise every incident pertaining thereto. Owning the upland and the littoral and riparian rights, he was entitled to compensation for a possible use. As was said in *United States v. Seufert Bros. Co.*, 78 Fed. 520:

"Use for which condemnation was sought in that case was for the construction of log booms in the Mississippi river adjacent to the lands condemned. The owner might use his land for this purpose on his own or on public account. The use was not necessarily a public one, and required no public license, so long as the navigation of the river was not ob-

structed. There is, therefore, no reason why the adaptability of the lands condemned for boom purposes was not a proper element to be considered in estimating the value of such lands."

In *Chicago etc. R. Co. v. Chicago*, 166 U. S. 226, 17 Sup. Ct. 581, 41 L. Ed. 979, the court, after admitting the general rule announced in the *Patterson* case, says: "Mere possible or imaginary uses, or the speculative schemes of its proprietor are to be excluded."

Compensation is given for taking or injuriously affecting the property of the landowner. Damages must be predicated upon the property itself, or an incident of the property. When a possible use is dependent upon the acquisition of an interest in property of another, no right of compensation accrues. The interest may never be acquired. In the instant case, respondents would have no right to maintain a boom on the tide lands of the state were we to hold as respondents contend that we should. The boom ground occupied by appellant is not located upon the property of respondents, or upon any property in which they have an interest; nor does it cut off any riparian right, for there can be no riparian right over tide lands. *Lownsdale v. Grays Harbor Boom Co.*, post p. 542, 103 Pac. 833. The boom ground is not taken by appellant from respondents, but occupied in virtue of a license granted by the state over its own property, property that is held under a title resting in the sovereignty of the state. It would do violence to the laws of Congress and of this state, as well as the Federal and state constitutions, to hold that the state, being the owner of the tide lands situate within its boundaries, could not sell them or grant a license to use them without first paying their value to an upland owner; or, in other words, compel the purchase of a right from one who did not possess it, one who could not give, grant, or sell the right to maintain the use upon which the claim for damages is predicated. This prin-

ciple is recognized, but not discussed, in the *Patterson* case, page 408, wherein it is said:

"We do not understand that all persons, except the plaintiff in error were precluded from availing themselves of these lands for the construction of a boom, either on their own account or for general use. The clause in its charter authorizing and requiring it to receive and take the entire control and management of all logs and timber to be conveyed to any point on the Mississippi river must be held to apply to the logs and timber of parties consenting to such control and management, not to logs and timber of parties choosing to keep the control and management of them in their own hands. The Mississippi is a navigable river above the Falls of St. Anthony, and the state could not confer an exclusive use of its waters, or exclusive control and management of logs floating on it, against the consent of their owners."

It follows that respondents cannot be compensated for the loss of a boom site, for they had no boom site to lose. To possess it they must have obtained title to, or permission to use, the property of the state. This they did not do. They have all that they possessed prior to the institution of this proceeding, and are entitled to no compensation other than for the physical disturbances that will result to their uplands within the rule laid down in our former opinion.

While it would be interesting, it would not be profitable, nor is it possible within the scope of this opinion, to trace the conflicting theories whether the king (the public) originally held title to shore and tide lands in fee, or subject to the riparian or littoral rights of the upland owner. It is settled in this state. Mr. Farnham, in his recent work on Waters, § 43, says:

"But at the time the governments were established in the American states the doctrine had become settled that the shore was a separate class of property which might and commonly did belong to the owner of the adjoining upland, but which belonged to the Crown unless he could be shown to have parted with it. Therefore the new states took title to all the shore which had not been granted by the Crown, or the Crown grants of which they did not choose to recognize.

This land they could dispose of as they could the other land which came to them by the transfer of the title from the Crown, and they could make whatever regulations they chose with respect to it. They might ordain, as did Massachusetts, that the grant of the upland would pass title to low-water mark; or they might expressly provide, as did Washington, that the title to the tide lands should remain in the public until expressly disposed of. Most of the states, however, made no express provisions upon the subject, and the question how far the title of the riparian owner extended was left to the courts for determination. The great majority of the courts acted upon the principle that, since the shore was a separate class of property and the grant from the state passed only what was expressly mentioned, therefore the shore did not pass with the grant of the upland."

The question is not a new one, but is consistent with the repeated rulings of this court, and is the only rule that will give force and effect to the assertion of title on the part of the state to its tide lands. The principal cases are cited in our former opinions. In the case of *Board of Harbor Line Com'rs v. State ex rel. Yesler*, 2 Wash. 530, 27 Pac. 550, the court said:

"The court is still of the opinion that, as against the state, a littoral owner, simply as such owner, can assert no valuable rights below the line of ordinary high tide. The somewhat careful examination which I have given this case has confirmed my opinion that at common law the sovereign power (resting in England in parliament) could take such lands without compensation, and absolutely exclude the littoral proprietors from any rights thereto. In fact, such is conceded to be the power of parliament by nearly all of the courts. Even those which have taken the strongest ground against the doctrine of the case above cited have admitted such to be the rule. . . . Here the people of a state are absolutely sovereign, except as controlled by the constitution of the United States; and I do not think that it can be successfully contended that the powers of the people of the states have been thus controlled as to the questions here involved. I am unable to find any clause of the constitution of the United States looking to such control, and, as I read the decisions of the United States supreme court, it has expressly

decided that the states are in no wise controlled in this matter. Acting within their sovereign power, as above recognized, the people of this state, in forming a constitution, saw fit to assert the title of the state to the lands in question, and having done so they are the only power that can interfere with such title. But it is said that, while such assertion of title is made in the constitution, it is so made subject to vested rights of the riparian owner to. be asserted in the courts. I am of the opinion that this vested right cannot be held to be such as is incident to the riparian owner simply as such, but must be held to apply only to some special right held by such owner by way of improvements made under express or implied license from the representative of the sovereign power. To hold that the former was intended, would practically destroy the title of the state, and would, therefore, be inconsistent with the assertion of such title; while the latter construction will give force to every word, and make the provision in its entirety a consistent one. When the people say that they assert the state's title, it must be held to mean the entire and exclusive title. Of course the rights of the state, as above stated, are subject to the paramount right of the United States to regulate commerce and navigation."

In the case of *Bellingham Bay etc. R. Co. v. Strand,* 4 Wash. 311, 317, 30 Pac. 144, the court said:

"Appellant further contends that the amount of damages awarded is greatly in excess of the sum warranted by the proofs. In this regard it is not claimed that there was no testimony in the case which would warrant the verdict rendered. The contention is that all or nearly all of the witnesses that testified as to the value of the property taken were allowed by the court to include in their estimate of said value certain prospective rights to the lands below the line of ordinary high tide in the waters of Puget Sound. That the witnesses were allowed so to do is clear from the record, and we must, therefore, decide whether or not this prospective contingent right was a proper element to be taken into consideration in determining the value of the property taken. We think that it was not. At the time these proceedings were instituted there was no law in force giving to the littoral proprietor any rights whatever in said tide lands, and under the decisions of this court in regard to the rights of littoral

proprietors in such lands the respondents had no valuable rights therein. It was left entirely to the legislature to say whether or not they should have any recognition as such littoral proprietors. Under these circumstances any value which was placed upon the property taken by reason of any rights which might or might not be bestowed upon it by legislation was too remote to constitute an element of value in proceedings of this kind."

In all the maze of cases bearing upon the abstract question involved, there are but few outside of the previous decisions of this court to offer as confirmation to those who demand authority rather than reason for the rule. In the case of *Cohn v. Wausau Boom Co.*, 47 Wis. 314, 325, 2 N. W. 546, it was held that, although in that state the upland owner had a riparian right to erect wharves and other structures on the shore lands, it is a private right resting, in the absence of prohibition, upon a passive or implied license by the public, is subordinate to the public use, and may be regulated or prohibited by law. The right to maintain a boom, under a law similar in all respects to our own, was sustained by the court. The court said:

"As against the riparian owners, within the limits specified in the statute, the state has only resumed its own. Otherwise, the title, possession and use of respondent's land remain intact. If the public action lessen its value, it is literally *damnum absque injuria.*"

The doctrine of this case was sustained in *Falls Mfg. Co. v. Oconto River Imp. Co.*, 87 Wis. 134, 151, 58 N. W. 257, wherein the plenary power of the state over navigable streams wholly within the state was affirmed, and the right to maintain flooding dams under a state law was held to be a legitimate exercise of legislative power, although it deprived an upland owner of the free use of a water power operated under a statutory authority prior in time to that of the improvement company. In the course of its argument the court said:

" 'The legislature is primarily at least, the judge of the necessity of the improvement; and when it delegates the

power to a corporation, and the state does not question that the improvement made by the corporation is in conformity with the delegated power, it seems to us that neither the necessity nor usefulness of the improvement, nor the manner in which it is made, can be called in question by private parties.' To the same effect, *J. S. Keator Lumber Co. v. St. Croix Boom Corp.*, 72 Wis. 80-87; *Underwood Lumber Co. v. Pelican Boom Co.*, 76 Wis. 85. The same doctrine has been repeatedly sanctioned by the supreme court of the United States. Thus, in *Huse v. Glover*, 119 U. S. 543, it was held: 'If, in the opinion of a state, its commerce will be more benefited by improving a navigable stream within its borders than by leaving the same in its natural state, it may authorize the improvements, although increased inconvenience and expense may thereby attend the business of individuals.' "

In *Sutter v. Heckman*, 1 Alaska 81, 87, it was held that the riparian and littoral proprietor had no right to, or control over, the tide lands below high-water mark. In the discussion of the case the court said:

"It has been held by many of the state courts of last resort that the owner of lands adjoining navigable water, whether within or above the ebb and flow of the tide, has, independently of local law, a right of property in the soil below high-water mark, and a right to build out wharves, so far at least as to reach water really navigable. This same theory, under the influence of the state statutes, has been indulged in by the federal courts in a few cases; especially in *Dutton v. Strong*, 1 Black 23, 17 L. Ed. 29; *R. R. Co. v. Schurmeier*, 7 Wall. 272, 19 L. Ed. 74; *Yates v. Milwaukee*, 10 Wall. 497, 19 L. Ed. 984; *St. Clair v. Lovingston*, 23 Wall. 46, 23 L. Ed. 59. But by the later decisions of the courts it is established that the rights of riparian or littoral proprietors in the soil below high-water mark of navigable waters are governed by local laws of the several states, subject only to the rights granted to the United States by the constitution. In the case of *Weber v. Harbor Commissioners*, 18 Wall. 65, 21 L. Ed. 798, Mr. Justice Field, in speaking of the right to occupy the tide lands, said: 'Any erection thereon without license is, therefore, deemed an encroachment upon the property of the sovereign, or, as it is termed in the language of the law, a 'purpresture,' which he may remove at pleasure, whether it tend

to obstruct navigation or otherwise.' Again, in *Atlee v. Packet Co.*, 21 Wall. 389, 22 L. Ed. 619, a riparian proprietor had no right, without statutory authority, to build out piers into the Mississippi river, as necessary parts of the boom to receive and retain logs until needed for sawing at its mill by the water side. In *Hardin v. Jordan*, 140 U. S. 371, 11 Sup. Ct. 808, 838, 35 L. Ed. 428, the court said: 'With regard to grants of the government for lands bordering on tide water, it has been distinctly settled that they only extend to high-water mark, and that the title to the shore and lands under water in front of lands so granted inures to the state within which they are situated, if a state has been organized and established there.' "

As a matter of equity, then, and not in recognition of any riparian or littoral right, the legislature has provided for the protection of those who had settled upon uplands abutting, or who had improved tide lands, upon the mistaken notion that they had thus acquired some rights of ownership. The improver and the upland owner may purchase at the state's price; thus protecting private interests and investments. Beyond this the state has not gone; and to now hold, after twenty years of settled policy, that a lease or license to use or occupy state tide land carried with it a burden of damages to be paid to an upland owner, would make the occupation of the tide lands all but impossible, and tend to restrain the development of our resources, our business, and our commerce. Indeed, in the opinion of the writer, the question has not been open to discussion since the case of *Shively v. Bowlby*, 152 U. S. 1, 56, 14 Sup. Ct. 548, 38 L. E. 331, was decided. In that case the reasoning of Justice Lord, of the supreme court of Oregon, was adopted as the law of the case. He said:

"From all this it appears that when the state of Oregon was admitted into the Union, the tide lands became its property and subject to its jurisdiction and disposal; that in the absence of legislation or usage, the common law rule would govern the rights of the upland proprietor, and by that law the title to them is in the state; that the state has the right to dispose of them in such manner as she might deem proper,

as is frequently done in various ways, and whereby sometimes large areas are reclaimed and occupied by cities, and are put to public and private uses, state control and ownership therein being supreme, subject only to the paramount right of navigation and commerce. The whole question is for the state to determine for itself; it can say to what extent it will preserve its rights of ownership in them, or confer them on others. Our state has done that by the legislation already referred to, and our courts have declared its absolute property in and dominion over the tide lands, and its right to dispose of its title in such manner as it might deem best, unaffected by any 'legal obligation to recognize the rights of either the riparian owners, or those who had occupied such tide lands,' other than it chose to resign to them, subject only to the paramount right of navigation and the uses of commerce. From these considerations it results, if we are to be bound by the previous adjudications of this court, which have become a rule of property, and upon the faith of which important rights and titles have become vested, and large expenditures have been made and incurred, that the defendants have no rights or interests in the lands in question."

The decision in this case does not depend upon the construction of a Federal statute, or of the Federal constitution, or any amendment thereto. The Humptulips river is a navigable stream entirely within the state of Washington, and, in the absence of any statute by Congress, a state has plenary power in regard to such waters. Obstructions in these waters may be offenses against the laws of the state, but constitute no offense against the laws of the United States, in the absence of a statute. *North Shore Boom & Driving Co. v. Nicomen Boom Co.*, 212 U. S. 406, 29 Sup. Ct. 355, 53 L. Ed. 574. The right of the state to dispose of the use of its tide lands is a question with which the Federal government has nothing whatever to do. Appellant, being in the lawful occupation of state land, has succeeded for the time being to all the rights of the state. It is exercising a public function within the law of the state.

"Acts done in the proper exercise of governmental powers, and not directly encroaching upon private property, though

their consequences may impair its use, are universally held not to be a 'taking' within the meaning of the constitutional provision providing for compensation." *United States v. Certain Lands etc.*, 112 Fed. 622.

See, also, *Northern Transp. Co. v. Chicago*, 99 U. S. 635, 25 L. Ed. 336; *Gibson v. United States*, 166 U. S. 269, 17 Sup. Ct. 578, 41 L. Ed. 996; *Meyer v. Richmond*, 172 U. S. 82, 19 Sup. Ct. 106, 43 L. Ed. 384.

Legislation has proceeded upon one of two theories with reference to tide and shore lands. The one, that the state will recognize a riparian right in the upland owner and compel the public to subordinate its rights (except as to navigation) to his convenience. The other is that the title to all tide and shore lands is in the state, and may be sold, leased, or otherwise disposed of in aid of business and commerce, and without reference to the comfort and convenience of the upland owner. This state has asserted the latter doctrine. It will thus be seen that this case involves primarily the question of state, policy. The state has a right to deal with its own property as its own. There is, therefore, no Federal question involved. The dissenting judges adhere to their former opinion.

The petition for a rehearing is denied.